1810.

MURRAY
*v.*
WILLIAMSON.

---

Lessee of FINDLAY and others *against* RIDDLE.

*Chambersburg,*
*Saturday,*
October 6th.

THIS came before the court by appeal from the decision of the Chief Justice at a Circuit Court for *Franklin* county in *June* 1807.

The lessors of the plaintiff who were the children of *John Findlay* the younger, deceased, claimed the premises in the ejectment under the following devise in the will of their grandfather *John Findlay* the elder, who, it was admitted by both sides, died seised in *October* 1783.

" I give and bequeath to my son *John Findlay*, all that " plantation and tract of land whereon I now dwell, situate in " *Letterkenney* township and county of *Cumberland*, bounded

A devise to *A* during his natural life, and " after his decease, if he " shall die leaving lawful issue, " sue, *to his heirs* " *as tenants in* " *common, and* " *their respective* " *heirs and as-* " *signs for ever;* " but in case he " shall die without leaving " lawful issue, " then to *B*, " the brother of " *A*," is only an estate for life in *A*

3 B 139
28 SC 465
28 SC 581

" &c. containing 400 acres with the usual allowance, &c. to
" hold to him the said *John Findlay, during his natural life,*
" subject to one full third part of the yearly rents and pro-
" fits thereof herein bequeathed to my wife and payable to
" her yearly and every year during her natural life, together
" with her other privileges as aforesaid; *and after my said son*
" *John's decease, if he shall die leaving lawful issue,* I give
" and devise the same plantation and tract of land *to his*
" *heirs as tenants in common, and their respective heirs and*
" *assigns for ever. But in case my said son John shall die*
" *without leaving lawful issue,* I give and devise the same
" plantation and tract of land to my son *James Findlay,* to
" hold to him his heirs and assigns for ever."

*John Findlay* the son, on the 26th of *October* 1799, in
conformity with the act of 16th *January* 1799, " to facilitate
" the barring of entails," executed and acknowledged in open
court a deed of the premises to the defendant, expressed to
be with intent to bar his estate tail therein; and on the same
day the defendant reconveyed. On the 23d *January* 1801,
*Findlay* and wife by articles of agreement with the de-
fendant, granted and sold him the premises, under which
articles the defendant received possession in the lifetime
of *John,* and now claimed to hold it against his children.

The single question was, whether *John Findlay* took an
estate tail, or merely for life.

Upon the trial of the cause, the Chief Justice told the
jury that the inclination of his mind was rather in favour of
the opinion that *John Findlay* took only an *estate for life;*
but as it was a question of considerable difficulty, he would
reserve the point; and if on mature reflection he should
think that *John Findlay* took an estate tail, a new trial
would be granted in case a verdict should be found for the
plaintiff, as he thought it ought to be.

The jury accordingly found for the plaintiff; and after ar-
gument upon the point reserved, which took place before
the Chief Justice on a motion for a new trial, he delivered
his opinion against the motion as follows:

Nothing can be more clear than that the testator meant
to give his son *John* an estate for life only; not solely be-

cause he has expressly said so, but because the fee simple which he has devised to his heirs, (that is, his issue or his children) is inconsistent with *John's* taking an estate of inheritance. The issue are to take as tenants *in common*, which they could not do, if *John* took an estate in tail. The intent was, that on *John's* death the estate should go immediately either to his issue in fee as tenants in common, or in case there was no issue, then to his son *James* in fee. It is a contingency with a double aspect, very like the case of *Luddington* v. *Kime*, 1 *Ld. Ray.* 203, and that of *Docking* v. *Dunham*, *Doug.* 251. It is true, that although the testator intends to give an estate for life, yet if the main and general intent is to give other estates inconsistent with an estate for life, there, the particular intent, being of less importance, shall give way to the general intent. As where there is a devise to *A* for life, remainder to his issue as tenants in common, and for default of such issue, remainder to *B* in fee; *A* takes an estate tail, because the main intent of the testator was, that *B* should take nothing, until there was a failure of the issue of *A*. But if *A* took an estate for life only, his issue would take for life only, there being no words to limit the inheritance to them, and on the death of each of the children his share would go over to *B*, while the rest of *A's* children were living, or even while issue of the deceased child was living; and thus the principal intent of the testator would be defeated. Upon this principle all the cases cited by the defendant's counsel turn; and therefore they are not applicable to the present case, where the intent to give a life estate to *John Findlay* is by no means inconsistent with the general intent of giving an estate in fee simple to his children as tenants in common. I am clearly of opinion, that the devise in question passed no greater estate than for life to *John Findlay*, and that the motion for a new trial should be discharged.

The question was now argued before this court by *Duncan* for the defendant, the appellant, and by *Watts* for the plaintiff.

*Arguments for the defendant.* An estate in fee-tail vested

in *John Findlay* by the rule in *Shelley's case,* (a) 1 *Inst.* 376 b. *note* 1, there having been in the same gift or conveyance an estate of freehold to *John*, and a remainder limited immediately to the *heirs* of his body.

Nothing can prevent this conclusion, but the overthrow of the rule itself, by permitting a supposed intention of the testator to control the legal operation of the word *heirs* as a limitation, and to convert it into the description of *purchasers*, as was attempted in the case of *Perrin* v. *Blake*, though the judgment in that case was reversed by seven judges against one in the exchequer chamber. The reasons of that rule, as they were given by Mr. Justice *Blackstone* in his great argument, namely, to prevent the inheritance from being put in abeyance, thus among other evils rendering the tenant for life dispunishable for waste, and also to facilitate the alienation of the whole estate one generation sooner than it otherwise would be, make it peculiarly applicable to the state of *Pennsylvania. Hargr. Law Tracts* 500. It was adopted in all its strength in the case of *James's claim* (b) in this state, a case very parallel to the present in many particulars.

Giving the estate to the first taker expressly *for his natural life*, is of no importance. So it was held in *James's case*, where many authorities are cited upon the point.

Neither is the rule superseded by making the heirs take a new superadded estate; " to his heirs and their respective " heirs for ever." *Shelley's case* had this very ingredient; " to " the use of the heirs male of the body of *Edward Shelley*, " and of the heirs male of the body of such heirs male." Where there is an estate to the ancestor for life, and then to issue, including all the issue, or to the heirs generally, or to the heirs of the body, the ancestor must take in tail, though the testator directs that the heirs shall take as tenants in common, or superadds words of limitation, unless these words create a new course of inheritance. The limitation here is to *John* and his heirs as tenants in common, and if he dies without issue then over. It includes every possible heir of *John*, and makes him the *terminus*, which regulates the descent.

(a) 1 *Rep.* 104.        (b) 1 *Dall.* 47,

The least that can be required in any case to dispense with the rule, supposing it not to be according to Mr. *Hargrave's* doctrine, indispensable, is to shew by the strongest and most conclusive evidence, that the testator intended to deviate from the general rule, and that his grandchildren should take as purchasers. *Blackstone* allows but four exceptions to the application of the rule. 1. Where no estate of freehold is devised to the ancestor, as in *John de Mandeville's case; Co. Litt.* 26. 2. Where no estate of inheritance is devised to the heir, as in *White* v. *Collins* (a). 3. Where words of explanation are added to the word heirs, shewing that the testator did not intend that word in its legal sense, but in a peculiar sense of his own; as in *Burchel* v. *Durdant* (b), where the devise was " in trust for *Robert* " *Durdant* for life, and after his decease to the heirs male of " his body *now living*," which of course excluded other heirs. 4. Where the testator has superadded fresh limitations, and grafted other words of inheritance upon the heirs to whom he gives the estate, shewing that he intended to make them the stock of a new descent, and that they were not considered merely as branches from their own progenitor. *Hargr. Law Tracts* 504.

The first two exceptions are out of the present case. The *third* cannot be applied, because the testator has not added any words to shew that *heirs* is to be understood in any but the legal sense. Whatever might be the effect of their taking as tenants in common in *England*, here all the children take by descent as tenants in common, which of course, prevents it from making a difference. All the other heirs were intended to take in succession. The words in the will include all possible heirs; and where that is the case after a limitation of a freehold to the ancestor, the heirs cannot take by purchase. 6 *Cruise* 403. 1 *Fearne* 309. The *fourth* exception has been a source of great difficulty and difference of opinion. The superadded words in *Shelley's case*, it is obvious, produced no effect. In *Dodson* v. *Grew* (c), which case resembles this, Justice *Clive* says, too great regard has been paid to the superadded words, " heirs male of the

(a) *Comyns* 289.　　(b) 2 *Ventr.* 311.　　(c) 2 *Wils.* 322.

Lessee of
FINDLAY
*v.*
RIDDLE.

" body of such issue." That was a devise to G for life, and after his death to the issue of his body, *and the heirs of the body of such issue,* and it was held an estate tail in G. There is no difference between the cases, except the tenancy in common here, which is of no consequence. In *Minshull* v. *Minshull* (a), where the devise was to the second " son of " *R. M.* and the heirs males of his body *and their issues,*" lord *Hardwicke* rejected the superadded words, and would not permit them to make " heirs male" words of purchase. In *Luddington* v. *Kime* (b), where some stress was laid by the court upon the additional limitation, " and to the heirs " of such issue for ever," the estate was to *Evers Armyn* for life, and if he had any *issue* male, then to such *issue* male and his heirs for ever. So that the word was *issue,* and not *heirs,* and therefore more appropriately a word of purchase. In *Goodright* v. *Pullen,* (c) this distinction is taken, and the devise construed an estate in tail in the first devisee, though the difference between this case and *Luddington* v. *Kime* was only between *heirs* and *issue;* " to *Nicholas Lisle* for " life, and after his decease, to the heirs males of the body " of the said *Nicholas and his heirs for ever;* but if *Nicholas* " died without such heir male, then over." The superadded limitation here, therefore, was of no consequence; and it may be asserted as a general principle that it is of no consequence in any case, except where it alters the course of inheritance, which it certainly does not do in the present instance; as if it were to *A* for life, and after his decease to the heirs of his body, and their heirs *female,* as in *Doe* v. *Laming* (d). The case of *King* v. *Burchall* (e) strongly resembles the present in this and many other points.

There being then none of the reasons in this case which sir *William Blackstone* requires to supersede the rule, the case comes back to the rule, which is superior to intention, if there exists, what no doubt there does, sufficient to bring the rule into application.

But in addition to this, the testator's general intention

(a) 1 *Atk.* 411.          (c) 2 *Ld. Ray.* 1437.          (e) *Ambl.* 379.
(b) 1 *Ld. Ray.* 205.      (d) 2 *Burr.* 1100.

was that the children of *John* should take by descent; and this removes every objection that can be raised against an estate tail in *John*. The devise is to *John* for life, and if he dies leaving issue, to his heirs for ever; and if he leaves no lawful issue, then to *John's* brother, who was of course his heir if there were no children. It is therefore, a devise to *John* for life, and if he left issue then to that issue, and if he did not leave issue, then to *James*, which was an estate tail in *John* by the authority of *Tyte* v. *Willis* (a). If *John Findlay* takes for life only, his children must take in tail; but they cannot take in tail without taking through their father. If the children took an estate in fee simple, then their father took an estate in tail. They take *quâ* heirs, and must take by descent. If they take as purchasers, then if a son of *John* died during his father's life, leaving issue, that issue could not take, because he would not answer the description in the will; but considering them to take by descent, every possible heir might take. It is defeating the general intent to insist upon an estate for life.

Whether, however, such a general intent existed or not, the rule of law is, in many instances, too strong for intention; *Robinson* v. *Robinson* (b); 2 *Fonbl*. 63.; and the greatest names in the history of *English* law, are to be found on the side of the rule in *Shelley's case*, to the whole of this extent. 6 *Cruise* 388. 396., *Hargr. Law Tracts* 561., *Powell on Dev.* 359. 360., *Jones* v. *Morgan* (c).

*Argument for the plaintiff.* Whatever contest the rule in *Shelley's case* may have excited, no one has ever yet gone the length of asserting, that the bare use of the word *heirs*, after a devise to the father for life, is sufficient to bring that rule into operation. It is enough to contend that the intention of the testator shall be beaten down by that rule, where he uses the word heirs in its *legal* sense; but Mr. *Hargrave*, the most learned and the most resolute champion of the rule, expressly agrees, that it has no application to a case in which *heirs* is used in a sense not legal or technical, but peculiar to the testator. Now, there can be no doubt, that the term *heirs*

(a) 1 *Cas. Temp. Talb.* 1.     (b) 1 *Burr.* 38.     (c) 1 *Bro. Ch. Ca.* 206.

in this will is a mere *descriptio personarum*, a designation of the children or lawful issue of *John Findlay*, and not a limitation to heirs general; and what distinction then is there between this case and that of *Luddington* v. *Kime?* The devise there was to *Evers Armyn* for life, without impeachment of waste, and in case that he should have issue male, then to such issue male and his heirs for ever, and if he should die without issue male, then to sir *T. B.* in fee. The same is also the case of *Doe* d. *Barnard* v. *Reason* cited in *Doe* v. *Holmes*, (a) which was a devise to *E. C.* the testator's niece for her natural life, without impeachment of waste, and immediately after her decease, to such issue of the body of the niece as should then be living, and the heirs of such issue; and if she died without issue, then over to the testator's cousins. In both these cases the first devisee took but for life.

Nothing is necessary, then, but to shew, that the word *heirs* may be so used by a testator as to be a word of purchase, and that it was so used by the maker of the present will.

This whole doctrine was reviewed in the case of *Bagshaw* v. *Spencer*, (b) by lord chancellor *Hardwicke*, who said that he conceived the rule in *Shelley's case* to be misapplied; for the principle of that case was to be applied not to the *construction of words*, but to the nature of the estates themselves; and that if the testator's intention appeared plain, as he was supposed to be *inops consilii*, the law would help an improper and unapt expression, by making the words *heirs of the body* words of purchase, and had done it in many cases. The same principle was asserted by the court of King's Bench in *Doe* v. *Laming*, (c) where the authority of *Bagshaw* v. *Spencer* was clearly admitted. The whole will must be taken together, and one part explained by another; and if by heirs of the body, children, or first and other sons are seen to be intended, the will is expounded as if heirs of the body were erased, and children inserted. *Lowe* v. *Davies* (d), 6 *Cruise* 348., *Goodtitle* v. *Herring* (e). There has never been an opinion in modern times that *heirs*

(a) 3 *Wils.* 242.        (c) 2 *Burr.* 1100.        (e) 1 *East* 264.
(b) 2 *Atk.* 580.        (d) 2 *Ld. Ray.* 1561.

*of the body* could not be explained by other parts of the same will, and shewn to be descriptive of particular persons, and not of the whole line of descendents. *Perrin* v. *Blake* in no manner affects this rule of construction; for there was no ground in that case to attribute to the testator an intention to use the words in any other than their legal sense. The arguments in that case, as well as in the discussions to which it gave rise, all concede the right to interpret the words according to the testator's meaning; their difficulty was of a different kind, the propriety of applying the rule in *Shelley's case* to wills at all, or if so applied, the propriety of permitting a testator, when he used *heirs* or *heirs of the body* in a legal sense, to intend that they shall be words of purchase. That their legal meaning need not be adopted, is abundantly clear. *Ginger* v. *White* (a), *Lessee of Cross* v. *Woodhull* (b), *Dodson* v. *Grew* (c).

That the word "heirs" in this case was used as a description of the persons, appears evident, from several circumstances; first, because the estate was devised to the heirs of *John*, only in case he left lawful issue; in the next place, because it is upon the death of *John* without lawful issue, that is without heirs, that it goes over to *James;* and thirdly, because, as *James* was an heir himself, there never could be a failure of heirs while he was alive, unless it was used in the sense of children. So that heirs means issue throughout. But there are further evidences of this intention. If "heirs" was used in a legal sense, and therefore a word of limitation, it was impossible that the children of *John* could take by descent as tenants in common; the oldest son of *John* would take the whole estate *per formam doni* as well in *Pennsylvania* as in *England.* The general intent therefore can never be executed but by giving a fee among the children, which can only be as purchasers; and hence the importance of the superadded words, which do change the course of inheritance by admitting heirs general, instead of special heirs, as would have been the case, but for the superadded words.

There is then in the outset, the plain particular intention

(a) *Willes* 348. (b) *Willes* 592. (c) 2 *Wils.* 322.

*1810.*

Lessee of
FINDLAY
*v.*
RIDDLE.

of the testator to give his son *John Findlay* but a life estate; there is the general intent that the children of *John* shall take as tenants in common in fee simple, which cannot be, unless *John* took an estate for life; and there are many indications that the word "heirs" was used by the testator in a peculiar sense of his own, which justifies the court in saying that they will understand it to mean children, and therefore a word of purchase, which will prevent the life estate from coalescing with the remainder, and becoming a fee tail in the father.

YEATES J. The present cause is an appeal from the decision of the Chief Justice, in overruling a motion for a new trial after a verdict found for the plaintiff.

The question rests on the true construction of the will of *John Findlay* senior, dated 9th *August* 1783, which was duly proved on the 24th *October* following. The words are as follow: " I give and bequeath to my son *John Findlay*, all " that plantation and tract of land whereon I now dwell, " situated &c., with the appurtenances, to hold to him the " said *John Findlay, during his natural life;* and after my said " son's decease, *if he shall die leaving lawful issue,* I give " and devise the same plantation and tract of land *to his* " *heirs as tenants in common, and their respective heirs and* " *assigns for ever.* But in case my said son *John* shall *die* " *without leaving lawful issue,* I give and devise the same " plantation and tract of land to my son *James Findlay, his* " *heirs and assigns for ever.*" *John Findlay* the son died in 1801; and the lessors of the plaintiff are his minor children, who sue by their guardian.

One judging of the language of this will unfettered by artificial legal rules, would have little difficulty in pronouncing the intention of the testator to have been, that *John* the son should enjoy the plantation during his life; and that his children, if he had any, at his death, should hold the same as tenants in common absolutely in fee simple; but if he had none, that then *James* the other son should hold the premises in fee simple.

The plainest reasons might be given for such an opinion. The father gave the lands to *John* for life in express terms. He could not mean to intail them; because the unavoidable

consequence thereof would be, that unless the intail was docked, the eldest son of *John* the devisee, would enjoy the whole in exclusion of the other children, in tail; and the lands would in like manner devolve on his eldest son, and so on from generation to generation, while issue continued; whereas here the testator had said or meant that *all* the children of his son *John* should inherit as tenants in common and their heirs and assigns respectively for ever. It would follow therefore, that if the devise to *John* was construed to vest an estate tail in him, violence would be done to plain words, and the meaning of the testator be totally disappointed.

But it has been strongly urged by the counsel for the defendant, that the legal operation of the words used by the testator, is too strong for his intention; which is supervened by rigid and imperious rules established for centuries, and which are esteemed the landmarks of property binding on the consciences of judges.

These objections shall be considered: if they are legitimately valid, it is our duty to bow to them. In the mean while, it becomes necessary to remark, that the intention of the testator has always been deemed the first, great, leading, fundamental rule in the construction of wills. It would be an absurd affectation of adroitness in case-hunting, to multiply authorities on this subject. When it is said, that wills must be consistent with the rules of law, the observation is not to be applied to the construction of words, but to the nature of the estates themselves. 2 *Atk.* 580. We are often told in our books, there is no magic in any particular form of words. As applied to wills, the remark is peculiarly just. This clearly appears in many familiar instances. To convey an estate in fee simple by deed, the word *heirs* is an indispensable term of art: so to create an estate tail by deed, words of procreation must be used, as *heirs of the body* &c. But the law benevolently supposes a testator to be *inops consilii*, and will carry his intention into effect, if his meaning is plain and perspicuous, though clothed in unapt words. Thus a devise of lands to one *for ever*, or *to do with at his will and pleasure* &c., will pass the fee simple. And the terms *proli, semini, issue, or children* in a will, will pass a fee tail, where

such appears to be the true meaning of the devisor. *Reynolds* justice asserted a clear truism, when he said, that a man shall be allowed to speak his mind in his will. *Fitzgib.* 113. The doctrine of the intentions of testators being carried into effect is laid down with great precision by Mr. *Butler* in his note on *Co. Litt.* 379 *a*, in these words: " It is certain, that " no rule of law has a more ancient origin, or is more gene- " rally established, than that if a testator expresses his inten- " tion defectively, either by not using technical and artificial " terms, or by using them improperly, yet if his intention " can be collected from his will, the law, however defective " his language may be, will construe his words according to " his intention; and if the object of it is warranted by the " established rules of law and equity, will admit its full " operation and effect. It is equally certain on the other hand, " that if the testator's intention appears to be to effect *that* " which the rules of law and equity do not admit, neither the " courts of law, nor the courts of equity can allow its opera- " tion. The first thing therefore, to be ascertained, is, what " the object of the testator is; the next, whether it is such as " the rules of law and equity admit."

I fully agree that the best rule in the construction of wills, is to find out first the general intent, and then as far as language and grammar will admit, to interpret particular expressions accordingly; and that in order to give effect to the general intent, the court will overlook a particular intent inconsistent therewith. Here, though an express estate for life was given to *John* the son, yet if to effectuate the great general intent, it becomes necessary to construe the devise to him as an estate of inheritance, the law will so construe it; as in the celebrated case of *Robinson* v. *Robinson*, 1 *Burr.* 38. There the special intent was defeated; the first limitation was to *Lancelot Hickes for life and no longer*. Nothing therefore could be more clear, than that the testator only intended to give him an estate for life; yet seeing that *that* particular intent was inconsistent with the testator's general intent, which was that the whole line of male heirs of *L. Hickes* should take, the court held themselves bound by law to effectuate that general intent.

The first ground on which it has been contended, that *John* the devisee took an estate tail, was, that when the father devised the lands after the decease of *John, to his heirs, if he died leaving lawful issue,* he thereby meant *his issue;* and that this is rendered still more clear, from the remainder over being limited to *James* in fee, *in defect of such issue;* because *John* the first taker could not be said to die without *heirs,* living his brother *James.* It has been resolved in many cases, that under a devise " *to* A *and his* " *heirs,* remainder over for want of such heirs," to a person who might take the estate as *heir,* the word *heirs* is thereby restrained to *heirs of the body,* and the devisee takes an estate tail. *Cowp.* 235., 2 *Fonbla.* 58. *Aliter,* when the remainder over is limited to a stranger. 1 *Roll. Rep.* 398., 3 *Bulst.* 192., 2 *Eq. Ab.* 305., 1 *Vez.* 89., 3 *Atk.* 617., 3 *Lev.* 70., *Cases temp. Talb.* 1.—Where one had issue *A* and *B,* and devised land " to *A,* and if he died without *heirs,* that *B* his " brother should have them," *A* took an estate tail. *Freem.* 74., 8 *Vin.* 219. *pl.* 9., *Willes* 165. 370. So under a devise " to *R. C.* for the term only of his natural life, and after his " decease to the issue of the said *R. C.* as tenants in com- " mon; but in case the said *R. C.* shall die without leaving " issue, then a devise of the same to *E. H.* in fee;" this is an estate tail in *R. C.* 1 *East* 229. The reason is plain. The clear general intent of the testator was, that all the issue of *R. C.* should inherit the *entire* estate, before it went over, and that *E. H.* should take nothing until the issue of *R. C.* wholly failed. If *R. C.* was intitled to an estate for life only, his children could take no larger estate, there being no words of limitation of the inheritance to them; and on the decease of any of the children, their shares would devolve on *E. H.,* while other children of *R. C.* were living; or even while issue of the deceased child was in full life, which would clearly disappoint the chief intention of the testator. But our principal case is differently circumstanced, by additional superadded words of inheritance to the heirs of *John, to them as tenants in common, and their respective heirs and assigns for ever.* There is nothing incompatible or inconsistent with the general intent, in declaring, that *John* should hold the plantation during his life, and his children if he had any, hold

the same after his death in fee simple, as tenants in common; but if he had none, that it should go over to *James* in fee. This materially contradistinguishes the will under consideration, from the cases cited by the defendant's counsel; in all of which, in order to give effect to the chief intention of the testator, it became indispensably necessary to hold, that the first takers were vested with an estate in fee tail. It seems to me fully to answer them.

But the great reliance of the defendant's counsel for their construction, is, on what is called the rule in *Shelley's case*, 1 *Co.* 104 *a.*, *Co. Litt.* 376., that " when the ancestor by any gift " or conveyance takes an estate of *freehold*, and in the same " gift or conveyance, an estate is limited either *mediately* " or *immediately* to *his heirs* in fee or in tail, always in such " cases, *heirs* are words of *limitation* of the estate, and not " words of *purchase*."

The existence of this rule is admitted; and so far as respects limitations of legal estates in conveyance by deed, its prescriptive claim to control seems established. Nor is there any difference of opinion as to its giving way to more prevalent principles of construction in marriage articles. But its authoritative controlling force in the construction of wills has led to a controversy, in which we find the most profound abilities anxiously and strenuously opposed. 2 *Fonbl.* 72.

Different *English* judges have expressed their opinion on the extent of the rule. We are likewise furnished with the learned observations of Mr. *Hargrave*, Mr. *Butler* and Mr. *Fearne* on its true application. Mr. *Hargrave* insists, that the rule is a conclusion of law upon certain premises so absolute, as not to leave any thing to *intention*, if the premises really belong to the case. *Hargr. Law Tracts*, 561. In such instances, he would apply the rule, even though the party should express in his will, that the rule should not be applied, and that the remainder to the heirs of the tenant for life should operate *by purchase;* though he admits that this strong sort of case has not yet occurred in a court of justice. *Ib.* 562. He holds the rule to be a policy of law, and that it is of a quality rigid, stubborn, imperious, irresistible, and so indispensable as to be above all exception whatever; *Ib.*; and that firm and immovable in its claim of sole empire, and looking

down on private intention as its lawful subject, the rule will neither give nor accept of any terms of capitulation. *Ib.* 574. Mr. *Fearne*, whose *Treatise on Contingent Remainders* was meant evidently to impugn the opinion of lord *Mansfield* in *Perrin* v. *Blake*, admits that the zeal of Mr. *Hargrave* had pursued the rule to an inflexible degree of *imperative* control, which would hardly be reconcilable with the long established principles applicable to the construction of wills, were it not for his resting the admission of the rule on a *previous question* referrible to the testator's intention. 1 *Fearne*, 294. 4th ed. Lord *Mansfield* in *Perrin* v. *Blake*, 6 *Cruise* 389, observes that he always thought, as the law had allowed a free communication of intention to a testator, it would be a strange law to say, "now you have commu-
"nicated that intention, so as every body understands what
"you mean, yet because you have used a certain expression
"of art, we will cross your intention, and give your will a
"different construction; though what you meant to have
"done is perfectly legal, and the only reason for contrave-
"ning you, is because you have not expressed yourself like
"a lawyer." His examination of the rule always convinced him, that the legal intention, when clearly explained, was to control the legal sense of a term of art, unwarily used by the testator. He held the rule to be clear law, but that it was not a general proposition subject to no control, as where a testator's intention was manifestly on the other side, and when the objections might be answered. *Ib.* 390. *Willes* and *Aston*, justices, concurred with him in his idea of the rule, the reason of which was long since antiquated; and therefore it should not be extended one jot. *Ib.* 382, 383. But *Yates*, justice, dissented, and held the rule laid down in *Shelley's case*, to be a rule of construction in the devise of a legal estate, binding on judges. *Ib.* 386.

Sir *William Blackstone* admits, that the rule when applied to devises may give way to the plain and manifest intent of the devisor, provided that intent be consistent with the great and immutable principles of *English* legal policy; and provided it be so fully expressed in the testator's will, or else may be collected from thence by such cogent and demonstrative arguments, as to leave no doubt in any reasonable mind,

whether it was his intent or not. *Harg. Law Tracts* 502, 503. But he was far from maintaining, that by a devise to a man's *heirs*, or *the heirs of his body*, they shall never take as *purchasers. Ib.* 504. They should be so construed, whenever the intent of the testator was clear and manifest. *Ib.* 507.

Lord *Thurlow* understood the rule to be, that where the *heir* took in the *character of heir*, he must take in the *quality of heir*. The rule had never been shaken at all, and he had never heard it contended that the testator could vary the sense of the law. *Jones* v. *Morgan*, 1 *Bro. Ch. Rep.* 216. By all the cases, where the estate is so given, that after the limitation to the first taker, it is to go to every person who can claim as heir to the first taker, the word *heirs* must be a word of *limitation*. All *heirs* taking *as heirs*, must take by descent. *Ib.* 219. According to Mr. *Cox* in his *note* 2. to 1 *Pr. Wms.* 132., this seems to be the settled law of *England*.

The rule is agreed on all hands, to be still an unbroken pillar of the feudal system, which cannot be demolished and thrown with the rubbish of the dark ages. 1 *Hen.* & *Mum.* 261. The maxim was originally introduced in favour of the lord, to prevent his being deprived of the fruits of the tenure; and likewise for the sake of specialty creditors. The reason of the maxim hath long ceased; because tenures are now abolished, and contingent remainders may be preserved from being defeated before they come *in esse:* yet having become a rule of property, it is adhered to in all cases *literally within it*, although the reason has ceased. But where there are circumstances which take the case *out of the letter* of this rule, it is departed from in favour of *intention*, because the reason of the rule has ceased. 2 *Burr.* 1107.

It has however been strenuously insisted, that where an estate of freehold is limited to the ancestor, no subsequent limitation *to his heirs*, or *the heirs of his body*, can make them *purchasers; Dubber* v. *Trollope, Ambler.* 462.; and that in such case, the inheritance will not go to all the heirs in the course of inheritable succession, unless by an actual descent; consequently if after the first taker, it is to go to every person who can claim as heir to him, the intended succession can only be effectuated by taking the word *heirs* &c. as words

of limitation. If after him, *all heirs* &c. are to take *as such,* that is, as answering that description, they can only take by descent. 1 *Fearne* 309.

Certainly, there are many cases which have been adjudged even at law, wherein the words *heirs,* and *heirs of the body,* as well as *children,* issue &c. have been determined to be words of *purchase,* some of which I shall proceed to enumerate.

In *Archer's case,* 1 *Co.* 66., the limitation was to *A* for life, and after to the next heir male of *A,* and to the heirs male of the body of such next heir male. The devise to the heir was held to be a remainder by purchase.

In *Wild's case,* 6 *Co.* 17., if a devise be to *A* and his children, and there be no children then in being, it gives an estate tail; because the devise is in words *de presenti,* and there being no children in being, they must take by way of limitation. But if a devise be to *A,* and *after his decease* to his children, *A* has only an estate for life; because then the words plainly shew that the children were intended to take by way of remainder.

In *Clarke* v. *Day, Moor* 593., *Cro. El.* 313., *Ow.* 148., *Ab.* 417. *pl.* 7., *A* devised lands to her daughter for life, and if she should marry after the death of the testatrix, and have any heirs lawfully begotten, then she willed that her daughter's *heir* should have the land after her daughter's death, and the heirs of such heir; and adjudged to be an estate for life in the daughter.

*James* v. *Richardson, Pollex.* 457., and *Burchett* v. *Durdant,* 2 *Vent.* 311., *Carth.* 154., arose on the same will. In both causes a devise to the heir male of *R. S. now living* was held good.

*Long* v. *Beaumont,* 2 *Vern.* 735., is cited 1 *Pr. Wms.* 229. There a devise to the heir male of *E. L.* lawfully begotten, and for want of such heir, to his own right heirs was held a good devise; although not to the heirs of the body, the description being supplied and made good by other words tantamount.

*Wedgward's case,* 1 *Rol. Ab.* 837. *pl.* 13., cited by lord *Hale* in the case of *King* v. *Melling,* 1 *Vent.* 231., was a limitation to one for life, *et non aliter;* and after his death to the sons of his body. Held that an estate for life only passed.

HARVARD
LAW SCHOOL
LIBRARY

*Lisle* v. *Gray*, 2 *Lev.* 223., *Poll.* 582., *T. Ray*, 278. 302. 315., *T. Jo.* 114., 2 *Show.* 6., arose on the effect of *a deed* as to the legal estate, wherein the words *heirs male of the body* were held to be words of *purchase*, by necessary construction arising from the context.

*Luddington* v. *Kime*, 1 *Salk.* 224., 1 *Ld. Ray.* 203., 3 *Lev.* 431., has strong features of resemblance to the case now in question. *A* devised land to *B for life*, without impeachment of waste, and in case he should have any *issue male*, then to such *issue male, and his heirs for ever.* Resolved, that *B* took an estate for life, and his issue male a contingent remainder in fee.

*Backhouse* v. *Wells*, 10 *Mod.* 181., *Fortesc.* 139., 1 *Equ. Ab.* 184. *pl.* 27., was a devise to *J. B.* for his life *only*, and from and after his death to the issue of his body lawfully to be begotten, with remainder to the heirs male of the body of that issue; and adjudged, that *J. B.* was tenant for life, with remainder to the issue in tail.

The cases of *Leonard* v. *the Earl of Sussex*, 2 *Vern.* 526., *The Earl of Stamford* v. *Sir John Hobart*, 1 *Bro. Parl. Cases* 288., *Withers* v. *Allgood*, cited 2 *Ves.* 237., *Ashton* v. *Ashton*, cited 1 *Ves.* 149., and *Bagshaw* v. *Spencer*, 2 *Atk.* 570., 1 *Ves.* 142., might also be adduced to shew the decrees of different chancellors in cases like the present.

*Fearne* in his *Essay on Contingent Remainders*, 236, 237, has remarked, that these are all cases of *trusts*, and no ruling authorities for the construction in cases of legal estates. I shall content myself with citing the words of lord *Mansfield* in reply. " A court of equity is as much bound by positive " rules, and general maxims concerning property, though the " reason of them may now have ceased, as a court of law is. " Whatever is sufficient upon a devise, to make an exception " out of the rule, holds in the case of a *legal* estate, as well " as in the case of a *trust*. If the intention of the testator be " contrary to the rules of law, it can no more take place in a " court of equity than in a court of law. If the intention be " illegal, it is equally void in both." 2 *Burr.* 1108. In the case of *Bagshaw* v. *Spencer*, all the cases upon this subject were ransacked and thoroughly considered: and lord *Hardwicke* held, that *heirs of the body*, after an estate for life

to the father, should be construed words of *purchase.* He asserted, that a plain intent of the testator would change those words from terms of limitation to those of purchase; and that lord *Talbot* had said, the rule of law was not *so strict,* as to control the testator's intent, where it was plain. 2 *Atk.* 582.

In *Law* v. *Davies, Fitzg.* 113., 2 *Ld. Ray.* 1561., 1 *Barnard.* 238., 2 *Stra.* 849., 2 *Equ. Ab.* 316. *pl.* 28., there was a devise to *B,* and his heirs lawfully to be begotten; that is to say, to his first, second, third, and every other son and sons successively lawfully to be begotten of the body of the said *B,* and the heirs of the body of such first, second, third, and every other son and sons successively &c. remainder over: And it was determined that *B* took but an estate for life.

In *Ginger ex dem. White* v. *White, Willes* 348, there was a devise to *A* for life, then to the children of *A* successively and their heirs, and if *A* died without issue, then to *B,* son of the elder brother of *A* in fee: it was held, that *A* took only an estate for life. It resembles in many particulars the will before us. Lord chief justice *Willes* strongly insists on the necessity of adhering to the intent and meaning of the testator; and declares, that he would always endeavour, if he possibly could, that the intent of the testator might take effect, and would never take pains to find out little niceties in the law, to defeat the intent of the testator. He laid down the rule of law, that a precedent estate devised by express words, cannot be lessened, increased, or altered by implication, though it might by express words. *Ib.* 355.

*Goodtitle ex dem. Cross* v. *Woodhull* et al. *Willes* 592., is to the same general effect, and was decided in the same manner.

*Doe on the demise of Long* v. *Laming,* 2 *Burr.* 1100., appears to me a strong modern authority for the plaintiff. It was determined in 1760. It was a devise of *gavelkind* lands to *A* and *the heirs of her body,* lawfully begotten or to be begotten, *as well females as males,* and to *their heirs and assigns for ever,* to be divided equally share and share alike, *as tenants in common,* and not as joint-tenants. And adjudged *una voce,* that *A* did not take an estate tail. *S. C.* 1 *Blac. Rep.* 265. The reasons of the decision are thus detailed in

1 *Fearne* 235, 6. The words *heirs of the body* did not stand independent and unqualified, but were corrected and explained very expressly, by the words which followed and were coupled with them; the words *as well females as males* annexed to the ,words *heirs of the body*, were incompatible with and expressly broke the descent; because *gavelkind* lands could not descend in that manner; and the devise expressly created a tenancy *in common*, which was impossible *by descent*, as that must have been in *coparcenary*. And besides, there were words of limitation *in fee* grafted on the words *heirs of the body*, which could not have been satisfied by an estate tail in the ancestor.

*Gavelkind* lands in *Kent* are equally divided among the sons on the father dying intestate. *Litt. S.* 210. This custom is in unison with our law; except that females here share equally with males the real estate of their father when he dies intestate. Previous to our act of 19th *April* 1794 the eldest son took a double share. Now all the above reasons apply to the case under consideration. The word *heirs* cannot point to the eldest son, but includes all the children of the first taker, as well female as male, which could not be the case if he took an estate tail. They were to hold as tenants in common, which could not be if their ancestor took an estate tail and the sons claimed successively *per formam doni*, and here are superadded words in fee to the *heirs respectively*, which are clearly irreconcilable with their father's taking an estate in tail.

The observations of lord *Mansfield* as to gavelkind lands in the case just cited, apply with peculiar force to the equal spirit of our laws regulating the descent of real estate. The term *heirs* (in the plural) in the case of gavelkind lands, answers to the term *heir* (in the singular) in the common case of lands which are not gavelkind. For the word *heir* (in the singular) would not serve for gavelkind lands, it must be *heirs* (in the plural.) Therefore all the arguments and reasonings that are applicable to the word *heir* (in the singular) in the common case of lands not being gavelkind, hold with equal strength and propriety, when applied to the plural termination *heirs*, when the lands are gavelkind. 2 *Burr.* 1110. Lord *Mansfield* concludes his opinion by saying, that there

is no rule of law that prevents *heirs* taking as *purchasers*, where the intention of the testator requires that they should do so. *Denison* and *Wilmot* justices, (*Foster* being absent) concurred with him in opinion, that the intention of the testator as disclosed in his will must govern its construction, provided the nature of the estate be legal, and the same sentiment is ascribed to lord chief justice *Wilmot* in *Keily* v. *Taylor*, reported in 6 *Bro. Parl. Ca.* 309, as cited by *Buller* justice in *Doe* v. *Lyde*, 1 *Term Rep.* 597.

This case having been argued before the Chief Justice, when the citing of *British* authorities subsequent to the *American* revolution was not prohibited, and considerable stress having been placed during the argument in bank, on the opinion of lord *Thurlow* in *Jones* v. *Morgan*, as summed up by *Cox* in his note on 1 *Pr. Wms.* 132, before cited, I do not deem it incorrect to state, that the opinion of lord *Kenyon* in *Goodtitle* v. *Herring*, 1 *East.* 272., accords with that of lord *Mansfield* as to the application of the rule in *Shelley's case*, and that lord chief justice *Alvanley* adopts an idea of the same kind, in *Poole* v. *Poole* et al., 3 *Bos.* & *Pul.* 627.

In *Hockley* v. *Mawley*, 1 *Ves. jr.* 143., lord *Thurlow* says, that where there is a devise to persons in remainder, after a tenancy for life, to take *distributively*, and according to proportions, they must take as purchasers, for there is no other way for them to take. See also *Goodright Lessee of Docking* v. *Dunham*, *Doug.* 251, (264.), *Doe Lessee of Comberbach* v. *Perryn*, 3 *Term Rep.* 490., *Seaward* v. *Willock*, 5 *East* 205., *Jacobs* et uxor v. *Amyatt* et al., 4 *Bro. Cha. Rep.* 542.

In the case of the *Lessee of Smith* v. *Folwell* determined in this court, *Tilghman* Chief Justice observed, that there is no doubt, that the word *heirs* may be construed as a word of *purchase*, when the testator appears to have used it with a view of *designating* a particular person. 1 *Binn.* 559. All the members of the court delivered their opinions much at large on what they severally conceived to be the true meaning of the will. *Ib.* 560.

The construction of wills should be favourable to the intent of the parties, and agreeable to *common* understanding. *Ander.* 60., 1 *Bulst.* 175., *Hob.* 304., 2 *Bl. Com.* 379. And where the intention of the will is plain, it ought to control the legal operation of the words. 2 *Pr. Wms.* 673., 4 *Burr.* 2246.

I admit, that the word *issue* is either a word of *purchase* or of limitation, as will best effectuate the testator's intention. I also hold, that *heirs* and *heirs of the body* have likewise been restrained as words of *purchase*, when the same were evidently used in a will in that sense; though I concede, they always give way *with greater difficulty* than the word *issue.* 4 *T. R.* 294, 299, 300. I use the expressions of Mr. *Hargrave* in his observations on the rule, p. 562, when I say that it clearly appears to me, that " the testator in this will " has applied the word heirs, in a *peculiar sense of his own."* Technical rules are not to be relied upon in explaining the intention of testators; and yet cases of intention are much embarrassed by authorities. An anxiety to effectuate what has been considered the leading intention of a testator, has introduced all the difficulty in this kind of cases. 1 *Bos.* & *Pull.* 221. See 1 *T. R.* 597., *Doug.* 327, (341).

According to *Fearne's* delineation of the rule in *Shelley's case,* it comprehends two discriminating lines, whose concurrence seems to decide its application; the one is, that the person to claim the inheritance *after the ancestor,* is to claim *as heir,* that is *eo nomine,* and under *that description,* whoever such person may be; and the other, that the effect of the limitation is not confined to the person so *first* claiming, or *his* representatives *as such,* of any description, but directed equally through *all other persons* successively answering the same relative description of *heirship* general or special, to the *ancestor* referred to, and intitling them *eo nomine,* or in that character only. 1 *Fearne* 310. He admits, that the latter branch of the distinction excludes all those cases, where the words of limitation superadded to the words *heirs* &c. denote a *different species of heirs* from that described by the first words; as in the case put by *Anderson* in *Shelley's case.*

Of the true meaning of this testator in the devise under consideration, I have not a particle of doubt. What greatly weighs with me in the technical legal exposition of the will, is, that so far from any words therein shewing a general intent to give an estate tail to *John* the son, in contradiction to the estate for life given to him in precise words, we plainly see that by con·

1810.

Lessee of
FINDLAY
v.
RIDDLE.

ferring on him such estate tail, we wholly defeat the provisions of the testator; whereas by giving him an estate for life, and a contingent fee to his children, we effectuate every intent both general and particular. I therefore feel myself authorized to construe the word *heirs* in the first part of the devise, as *children*, or *sons* and *daughters*, and as a mere *designatio personarum;* and I conceive that they were to take in fee simple, in the same manner as the remainder over was limited to their uncle *James;* and that such devise was perfectly consistent with the established rules of law.

Upon the whole, I am of opinion, that the judgment of the Circuit Court should be affirmed.

BRACKENRIDGE J. It occurs to me to make a grammatical analysis of the words of this devise. " If he shall die " leaving lawful issue, I give and devise to his heirs as tenants " in common, and their respective heirs and assigns for " ever." For the pronoun, *he,* substitute the noun for which it is used, and the sentence will be, " If my son *John* shall " die leaving lawful issue, I give and devise to his heirs." The word *his* must refer to *John,* because the issue might be *female,* and the word *his* would not correspond; and issue might be *plural,* and *his* would not correspond. It must therefore be, " If my son *John* shall die leaving lawful issue, " I give to *John's* heirs, and their, &c." The word *their* must refer to *heirs* before mentioned; and therefore the whole sentence must be, " *If my son* John *shall die leaving* " *lawful issue, I give to* John's *heirs, as tenants in common,* " *and heirs' respective heirs and assigns for ever."*

The first branch of the sentence, with the nouns substituted for the pronouns, will be, " If my son *John* shall die " leaving lawful issue, I give to *John's* heirs, &c." Does the word *heirs* here mean all that can claim descent from the same common ancestor, or heirs general? If so, why in the next branch of the sentence, *heirs of heirs?* The fee had been sufficiently given before in the life estate to *John,* with the remainder to *John's* heirs. This proves, that by *heirs* in the first branch of the sentence, is meant *issue;* and the devise in that case will be, " If he shall die leaving issue, I " give to his issue." The word *their,* must in that case be

supplied by the word *issue;* for it is that instead of which it is used; and the whole devise will then be, *If my son* John *shall die leaving lawful issue, I give to his issue, and issue's respective heirs and assigns for ever.*

The word *heir*, in the first branch of the sentence, meaning issue, it might be natural to understand the word heirs in the last branch to be the same; and so, it would be to his issue, and issue's respective issue and assigns for ever. This gives the inheritance to the remotest issue. But, on the failure of issue, who would take? Not the *remainder man;* for his contingency had gone, on *John's* dying leaving lawful issue. It must be one who can trace his ascent to some common ancestor; and therefore the word *heirs* in the last branch of the sentence, must mean more than issue, and be taken in a technical sense, and mean general heirs, to avoid an escheat on the failure of issue. Having thus ascertained the meaning of the *terms*, I come to consider the *effect* of them in this devise.

The word issue is a word of *limitation*, or of *purchase*, accordingly as it is used as a *nomen collectivum* or *nomen singulare.* The word *respective*, fixes the meaning of the word here to be *nomen singulare;* for it is a term of individuality, and must have *several* to refer to. *Tenants in common* also imply several. So that it is used here as a word of purchase. And, even if we take the word *heir* instead of the word issue, it must receive for the same reason the same construction. Distinct issues taking at the same time, is inconsistent with a taking in tail, where but one can take at a time; and the taking by distinct issues must be *in succession.* It is clear, therefore, that the testator did *not mean* an estate tail; nor, will the terms *necessarily* carry it.

But the law will warrant the construing it an estate tail, if it be necessary to effect *the intent*, even at the expense of a *particular* intent, and to reach this, will reject and supply words; as, in this case, the word *respective*, and the words *tenants in common.*

This will introduce the inquiry, what was the *general intent? It was the providing for the issue of* John *the son.* Could a grandchild take under the term issue? It must be so; otherwise, no child being left, but a grandchild, the re-

mainder would go over from the issue. But a tenancy in common of a grandchild with a child was not intended; and it will disturb the *proportion* of the issue in the first degree. There may be *several grandchildren of one child.* All these to take *per capita,* will not be within the *intention;* and they must take *per stirpes,* if the intention was observed; in *loco parentum,* and *as heirs.* Whether they can take *as heirs,* not construing the devise an estate in tail, will be *the pinch of this case,* which I will by and by consider; but in the mean time I will ask, will it effectuate the intention better, to construe it *an estate tail?* Each of the offspring has, in that case, an equal chance of coming to the whole estate, by succession; but not an equal chance, *in point of time;* and the taking is liable to be defeated altogether by a *bar of the intail;* and defeating not only a taking by the issue, but, in case of no issue left, defeating the taking by *him in remainder over,* who, in this case, is a younger son of the testator, and for whom he must be supposed to intend strongly this interest, which is more particularly marked by making him an *executor.* So, that it may not be so clear that an estate tail will best effectuate the intention, with regard to the issue; and certainly, with regard to the remainder man, in case of the contingency in his favour, *not at all.*

But will not the law imperatively construe this an estate tail? That is to say, will not the *legal rules of construction,* which are rules of property, make this an estate tail?

*Hargrave,* in his observations concerning the rule in *Shelley's case,* 1 *Law Tr.* 574., has laid down what he conceives to be the first step in the investigation of the application of this rule. That is, whether by a remainder to the heirs either general or special of the preceding tenant for life, it is the meaning of the instrument, to include the whole of his inheritable blood; or to design only a certain individual person answering to the description of the heir at his death; or, as we would inquire in the case before us, certain individual persons *answering to the description of heirs at his death.* Nothing can be better founded, says *Fearne,* in his comment on these observations, than " that the application of the rule supposes " the *intention discovered.*" 1 *Fearne* 295. And though this discovery, which must be made previous to the application of

the rule, is spoken of by *Hargrave* as " of all juridical ques-
" tions the most simple," yet *Fearne*, with whom I agree,
considers it as the *hoc opus, hic labor.* He subjoins, however,
what he conceives to be reducing the inquiry respecting the
admission of the rule to two simple questions, viz. " is the
" limitation to the heirs &c., so calculated and directed, that
" the person claiming under it must intitle himself merely
" under the description of heir of the species denoted by the
" words, in their technical sense? And if so, is there any
" thing to restrain the same words from equally extending
" to, and comprehending all other persons successively an-
" swering the same description; or from intitling them alike
" under it, and *eo nomine* only? A negative answer to either
" branch of this inquiry seems to exclude the application of
" the rule."

Putting these questions, in the present case, I ask, of
what species are the heirs spoken of in this devise, *general*
or *special?* They are *special* heirs; heirs of the body. But
is it merely under the description of heir of the body, in the
technical sense, that these could claim? If I was to answer
and say here, that the heir claiming in this case must be
àn heir of the body, yet I could not say that there is any
thing to restrain the same words from equally extending to
and comprehending all other persons successively answering
the same description; or from intitling them alike under it,
and *eo nomine.* For it is not the *eldest born,* or first issue
only that can take under this devise; but the *younger born*
may equally take. Nay it is a part of the devise; and under
the same denomination of issue with the eldest born. For
his *heirs* must be referred to issue, as those heirs which are
to take.

I cannot doubt but that by the word heirs the testator
meant issue, and by their heirs, he meant their issue, and
intended to restrain the devise to these taking from the im-
mediate issue as a new stock, and not by descent from the
testator as the *terminus a quo.* The words " *their respective
heirs,*" must intend other than those that would be equally
heirs, which must be the case, to all claiming through the
same ancestor.

By the tenancy in common, *the descent must be intended to be broken.* Our statute of distribution, in the case of intestacy, gives a tenancy in common of a fee simple estate. But an *estate in tail is not the subject of an intestacy.* The law regulates the descent to the heir in tail, which shews, at least, that the testator did not use the word heir as meaning heir in tail in his own intendment.

But there are *rules of construction by which the intention must be ascertained;* and these will control the discretionary construction of a judge upon what appears to him the *apparent* intention: certain established legal maxims deducible from decisions. These are, such as construing words according to their technical signification, unless by relation to some other word, they are shewn to be used in a *popular* sense. As, in the devise in question, where the devise being, " if he shall die leaving lawful issue, I give to his heirs," shews, by relation to the word issue, that by heirs he meant issue. And in the next part of the devise, " to their respec- " tive heirs," shews that he refers to heirs of a new *terminus,* and *the ingrafting an inheritance upon a separate stock.* The tenancy in common also evinces this, which, in the language of *Fearne,* is impossible by descent. 1 *Fearne* 107, 237. So that it is inconsistent with the idea of meaning an estate tail in the son, to devise a *tenancy in common* to the issue, of whom but one can take, unless in succession, and that *the whole.* And this was laid down as a ground of construction by *Mansfield* and *Wilmot* in the case of *Doe* v. *Laming,* 2 *Burr.* 1110. And, in the illustration of those questions which *Fearne* makes a criterion of the application of the rule in *Shelley's case,* from the evidence of the intention, he considers all those cases as excluded from the operation, where the words heirs of the body &c. are by other words of reference or qualification explained or restrained to the *first and other sons,* as well as those wherein, on account of words subjoined, persons to take cannot take as heirs or by virtue of that description, by reason of the distributive direction among several not constituting an heir; or as tenants in common; or in some other mode not reconcilable with the course of descent, as in *Doe* v. *Laming* and others of that sort.

But *the pinch* at which I have already hinted, is the *con-*

1810.

Lessee of
FINDLAY
*v.*
RIDDLE.

sequence, *in a possible event*, of not construing this devise an estate tail. For, in construing a will we must put ourselves in the situation of having it laid before us, at the time of the writing, and as looking then, to what might turn out to be the application of our construction, at the time of the decease. As for instance, in this case, the possible dying and leaving lawful issue immediate and remote, with a *plurality* in the representatives of one, who, if they take at all, it must be *in loco parentum;* that is, not *share and share alike* with the immediate issue living, but the share of the parent deceased.

Something was thrown out in the course of the argument, at the bar, by the counsel contending for the estate tail, of a confidence of what the opinion would be of the elder of the profession were it taken, on this devise. The case being held under advisement, and it so happening that I had an easy opportunity, I put the case to one of the *eldest and ablest of the profession* in the state, and totally unconcerned in the matter, but submitted merely as a problem in legal science, in that abstruse part of it, the doctrine of devises and contingent remainders. His note to me I hold in my hand and will read it. It is as follows:

" Is the rule in *Shelley's case* conclusive? No. Where an " estate for life is given, with intention expressed by *declara-* " *tion plain* (*Hobart*) that issue,—children—first and every " other son, even heirs of the body lawfully begotten, (2 *Bur.* " 1101) shall take *as purchasers*, the express estate for life " shall not by construction, or implication, be enlarged to " an estate in tail.

" The intention in the present case is most evident, that " the *issue of* John, *alive at his death*, should take a fee. The " words " and to their heirs and assigns for ever" demon- " strate such intention. In the arguments respecting similar " cases, it has been contended that issue is *nomen collectivum,* " and comprehending all future issue to the latest genera- " tions; hence it has been concluded that issue cannot be a " word of purchase, but of limitation annexed to the taker " for life, uniting to his estate all possible issue at ever so " late a period, and thereby necessarily creating an estate in " tail in the devisee for life. The stress of the argument is,

" to shew that issue is not to be considered as a word of
" purchase; but it cannot apply to the present case, where the
" *intention* is plain that it shall be a word of purchase. It is
" of the essence of an estate in tail, that issue *ad infinitum*,
" 1000 years hence, are looked upon to be included in it.
" Without such *view* there can be no estate in tail. Does
" the death of the child in *John's* lifetime, (a possible event)
" create a difficulty, such child having left a child who sur-
" vived *John?* It seems that it does not. The estate in-
" tended to be created by the testator was conditional. If
" *John* left issue, (at the time of his death) such issue was
" to take a fee *in common*. Neither by the words, or inten-
" tion, is the condition to be fulfilled by the existence of *im-*
" *mediate* issue,—to wit, a child,—issue only is called for, and
" to be in existence, at a lawful time (the death of the de-
" visee for life) for the fulfilment of the condition. *Issue;* a
" great great grandchild is *issue*, and certainly intended by
" the testator. Was it his meaning that if *John* left a son—
" he *John* should only have an estate for life; but, if he left
" a grandson, *John* should have an estate in tail?

" As to *the tenancy in common*, the peculiarity of the word-
" ing seems to relieve us from difficulty in the case put. " I
" give to his heirs" shews how issue were to take, viz. *as*
" *they were heirs*. The testator may reasonably be pre-
" sumed to have contemplated that *John* would die, leaving
" a son *B*. and grandchildren *E. F.* sons of *C.* a deceased
" son—then how are *B.*, *E.* and *F. issue* alive at the death of
" *John*, to take? Surely *as* they were heirs. *B.* one half—*E.*
" and *F.* the other half. He dont mean heirs general, but
" such as were issue of *John* alive at *John's* death. The
" word " heirs" in a will is always understood such heirs as
" testator meant. 1 *Vesey* 25. If an estate tail is to be raised
" here, it must be by implication. What is the rule? When
" necessary " to effectuate the *manifest general* intention of
" the testator;" the words of Mr. *Harvey* arguing in favour
" of an estate in tail. 3 *Burr.* 1634.

" It is fatal to the idea of an estate in tail, that *indefinite*
" issues of *John* were not contemplated by the testator—in-
" definite in point of time—on the contrary, issues at *John's*
" death then alive."

So far the note of this gentleman; and if correct in what I call the *pinch of the case*, as to the issue remote taking by purchase, and the proportion of the stock in the first degree, and *as heirs* would take in case of a descent, there is nothing in the way of effectuating the general intent of providing for the issue, in any event that may happen, *construing this an estate tail.* The *particular* intent may then stand of giving the first taker an estate for life.

In contemplation of law, the barring the intail by a fine and recovery is not a defeating the *general* intent in favour of the issue; because a fee of equal value is supposed to come for their use; but this being but a fiction, the general intent is in fact destroyed, and the issue are left without provision. Shall we then raise such *an estate by construction*, as will destroy *the general intent*, by putting it *in the power of him to destroy it*, out of whose power it was intended to be kept, by the giving him but an estate for life? I do not think that any possible event could justify it; and that, if even remote issue could not take under the denomination of heirs, this event not contemplated by the testator ought not to be provided for *at the expense of any intent contemplated and expressed.* I think myself therefore warranted in construing the estate to *John an estate for life*, and *not an estate tail.*

Judgment affirmed.