# Vernor's Executors *v.* Fisher et al.

Devise of two-thirds of a plantation to the two daughters of the testator's de-
ceased brother. There were three daughters. *Held,* that the devise was
not void, but was to be construed as being to all the daughters; the circum-
stances explaining the ambiguity making it evident that such was the in-
tention of the testator.

· ERROR to the District Court of Lancaster.

The opinion of the district court contains a sufficient
statement of the facts of this case for a proper understand-
ing of the point decided.

HAYES, President.—The question in this case is, whether
the devise in the first item of the last will and testament
of Benjamin Vernor, deceased, unto the two daughters of
his deceased brother, John Vernor, and unto John T. Ver-
nor, the grandson of his said brother, John Vernor, de-
ceased, of his plantation or tract of land whereon he the
testator then lived, &c., is a void devise, so far as regards
the daughters of John Vernor, or not. This is a case of
latent ambiguity. It is proved that John Vernor's daugh-
ters were three in number, namely, Martha, wife of Wil-
liam Hilton; Margaret, widow of Charles D. Cooper; and
Mary, widow of John Cuyler. What, then, was the inten-
tion of the testator in devising to the two daughters of his
deceased brother John? Did he intend a benefit to all the
daughters of his brother, or did he intend to give the two-
thirds of his plantation in this way, if it could be so given,
or otherwise not to give it at all? The original notes of
the testator's instruction to the scrivener are made a part
of the case, and materially elucidate the obscurity of this
devise.

The testator begins the instructions of the 8th of Febru-
ary, 1830, thus: "To John T. Vernor, of Albany, grandson

of my brother, John Vernor, my plantation with the buildings and appurtenances, containing upwards of 200 acres more or less, in Leacock township, Lancaster county, adjoining lands of Thomas Lyons, John M'Casky, Thomas Lyon and others, to hold to him the said John T. Vernor, his heirs and assigns for ever.　This land I got by my father, John Vernor's will."

He next bequeaths a legacy of 8000 dollars to James V. Henry, son of his deceased sister Elizabeth, and then bequeaths to Robert Clinch, son of Benjamin Vernor Clinch, and grandson of his sister Hannah, 4000 dollars.

He thus gives, in these first three clauses of his original instructions, the bulk of his estate to certain descendants of his brother John and of his sisters Elizabeth and Hannah; and in giving his plantation, his homestead, to John T. Vernor, the grandson of his brother John Vernor, he subjoins the remark: "This land I got by my father John Vernor's will."　The only alteration which he subsequently made in this disposition of his estate among his relatives, was in the first clause;—the devise of his plantation, and his instructions concerning it, the scrivener thus noted, a few days before the will was made: "The plantation given in my will to John T. Vernor, I revoke the devise thereof, and now give the same to the two daughters of my brother, John Vernor, deceased, (aunts of the said John T.) and to the said John T. Vernor, their heirs and assigns for ever; to wit, each to have one undivided third part thereof."　This altered devise was drawn out in the will, in the following words: "Item. I give and devise unto the two daughters of my deceased brother, John Vernor, and unto John T. Vernor, the grandson of my brother, John Vernor, deceased, my plantation or tract of land whereon I now live, situate in Leacock township, in the county of Lancaster, adjoining land of Thomas Lyon, John M'Casky, Thompson Jacobs and others, and the old Philadelphia road, containing upwards of 200 acres, should it be more or less, to

have and to hold the same to them, the two daughters of my deceased brother, John Vernor, and to the said John T. Vernor, their heirs and assigns for ever, each to have an equal undivided third part thereof."

It does not appear, that the testator was personally acquainted with these daughters. Mr. Moore states, that he had a perfect and distinct knowledge that his brother John had three daughters living in 1829. He does not, however, say, that Benjamin Vernor ever saw them, or any of them; and it is inferable from his testimony, and I infer, that whatever knowledge the testator had, was derived from conversations with the witness and others, with respect to his family connexions. It would not be singular, that a man of B. Vernor's age (about 87 or 88 years) should have known from the report of others in 1829, that his brother had three daughters then living, and yet in 1830 should have forgotten that there were more than two. The probability of his having forgotten it, is the more reasonable, from the great number of his relatives, the distance at which they resided from him, and his own unsocial life and temper. That he did forget the circumstance of the precise number of his brother's daughters, is evident from the phraseology used in describing them; for he does not describe them by their names, which, had he known or remembered them, he probably would have repeated; and having forgotten their names, it is the less strange he should forget their number. He does not devise to *two of the daughters* of his brother, or *two daughters* of his brother, as if he had known there were more than two, and simply wished to bestow his bounty on two only, and not on all; but he employs the very phraseology he would have chosen, had he supposed there were but two daughters of his brother living, and intended to make them devisees. "I give and devise unto *the* two daughters of my deceased brother, John Vernor, &c., to have and to hold to them, *the* two daughters," &c. No fact is stated, that was calculated, or

[Vernor's Executors *v.* Fisher.]

that tended to induce him to select any two of three; nor is there a word, indicating the purpose to make a discrimination. Had he so designed, there are many descriptive phrases which would have answered the end, without even naming his nieces: such as, "the youngest two,"—"the eldest two,"—or, "the oldest and youngest,"—or, "the married and elder widowed daughter,"—or, "the younger widowed daughter," &c. It is impossible to believe, that he could have intended to exclude any one of these daughters of his deceased brother from his bounty, because the expressions of the devise do not point to any one, to be excluded, nor designate the two who are to be preferred. But he devises, in general terms, "unto the two daughters of my deceased brother, John Vernor," &c. I take it, therefore, that no one can doubt the testator was ignorant, at the time he dictated this devise, that there were *three* daughters of his deceased brother, John Vernor, then living, and that he actually believed there were but *two.* What, then, was the object of the devise in question? Was it to give a part of his land to all the daughters of his brother? · Or was it to give to some *two* of them; and if the devise would not be valid in that way, (according to the argument in behalf of the plaintiffs,) not to give it at all? This question appears to be already answered. If the testator believed that there were but *two* daughters of his brother John, his intention was, by this devise, to give a part of his plantation to *all.*

There are other considerations arising out of the case which make such an intention more manifest. The grandson of his brother John was, in the original instructions given to the scrivener, the first and chief object of his remembrance. Upon him he bestows his plantation; and to the directions which he dictated in regard to this important devise, he adds the significant explanation, that this land he got by his father, *John Vernor's will.* The associated, influential sentiment, is obvious: *It is reasonable,*

*therefore, that I should leave it to his son John, if he were now living; and, being dead, that it should go to his descendants. I therefore leave it to his grandson bearing the same name.* There was an interval of four months before the will was drawn, and the subject of the devise appears to have occupied his attention in the mean time. Other reflections arose. If it were reasonable, that he should leave this plantation to his brother John, were he living, was it reasonable that he should pass by his brother John's daughters, his immediate living descendants, and give it all to a grandson? He came to the conclusion that it was not; and the result was, that these daughters became collectively, instead of John T. Vernor, the principal objects of his bounty— for he devises to them first, and gives them two-thirds of his plantation. Another consideration makes it plain, that the change in the disposition of his homestead, was not occasioned by any diminution of regard for or confidence in John T. Vernor; for, in the second instructions given to the scrivener, in which the devise is thus altered, he makes John T. Vernor one of the executors of his will, in the place of James Buyers, who was originally nominated. In distributing his estate among his relations, the testator's memory seems to have clung to his brothers and sisters. Thus in the three items, in which he gives the great bulk of his property to them, he in each instance designates the objects of his bounty, by their relationship to his brother John and his sisters Elizabeth and Hannah. It is true, that in all the other instances, he likewise *names* the particular objects; which is a persuasive circumstance to show, that he omitted the names of his brother John's daughters, only because he was unacquainted with them. With respect to the devise in question, the important consideration with the testator, apparently, was to give to the daughters of his brother, not on account of their personal qualities, names, particular situation, supposed number, fortune or condition, but as the daughters of his deceased

[ Vernor's Executors *v.* Fisher.]

brother John. This was the prominent idea, and it is inconsistent with the supposition of an intent to bestow his bounty upon two of those daughters, in exclusion of a third. Add to these considerations, the utter improbability that such a man as Benjamin Vernor, had he known that there were three daughters of his brother John then living, would, in disposing of what he must have considered the most precious part of his estate—his mansion farm—and which was in fact the most valuable portion, give it to two of those daughters, without designating which, in terms so uncertain as to render the whole devise a mockery, and it must be perfectly clear to every mind, that he intended to devise the two-thirds of his plantation to all the daughters of his brother John, though, at the same time, he believed there were but two.

The distinction taken in some of the English cases between a bequest of personal property and a devise of real estate, with reference to the means of ascertaining the testator's intention, has nothing to sustain it, except the relics of that inordinate regard for the latter species of property, which arose out of the feudal tenures, and which once deemed all jurisprudence as subservient to its uses. The reasonableness of the distinction has been questioned in England, on principle; and as the object, in each case, is the ascertainment of the real situation and intention of the testator, it is admitted to be difficult to conceive, that there should be any diversity as to the means. Stark. Evid. part 4, p. 1699. In other English cases of devise, I do not find that this distinction has been noticed, but the construction has been freely aided by extraneous parol evidence. In *Goodtitle* v. *Southern*, the devise was, of "all that my farm, lands and hereditaments called Trogue's farm, situate within the parish of Darley, in the county of Derby, now in the occupation of A. Clay, unto my brother John Southern and to his heirs and assigns for ever." Lessor of the plaintiff claimed under the residuary clause

[ Vernor's Executors *v.* Fisher.]

in the will, which it was admitted would entitle him to the premises in question, provided they did not pass to the defendant under the above devise. It was proved that Trogue's farm was in the occupation of A. Clay; but the closes in question were not in his occupation, but in the occupation of M. Marsden; and in order to show that they were not parcel of Trogue's farm, and that the testator Richard Southern, did not take them as such, the will of one Houghton was produced, which contained the following devise to Richard Southern: "Also all that piece or parcel of ground, situate in the liberty of Wansley, in the parish of Darley, commonly called or known by the name of Trogue's, otherwise Trough's pasture, called by the name of Dale closes." Richard Southern, when he became entitled to the land under Houghton's will, let two closes to Marsden, and evidence was offered of payment of rent by Marsden to Southern, in order to show that the latter knew in whose occupation the land was. On the part of the defendant, a notice to quit was proved, which had been given to Marsden by Richard Southern, a few months before the time of making his will; which notice was in these terms: "I do hereby give you notice to quit and deliver up the possession of all my lands belonging to and called Trogue's farm, situate in the parish of Darley, now in your possession, on or before Lady-day next." This evidence was objected to by the counsel for the plaintiff, but was received on the trial. The point as to its admissibility, was afterwards argued in the court of king's bench, where it was decided that the evidence was admissible. This, it will be observed, was a case of real estate; and the question was, whether the devise of two certain closes should go to the testator's brother, or to the residuary devisee. It was, consequently, a question affecting the quantity of estate devised to John Southern; in short, whether he should take Trogue's farm with these two closes or without them. So far from confining the parties to the

terms of Richard Southern's will, in order to ascertain the testator's meaning, the court permitted them to go into another will, to see how, and with what parcels, Trogue's farm was devised to Richard Southern. They were also permitted to prove, that he let those closes to Marsden, and that Marsden paid him rent. The only evidence which seems to have encountered objection, was that of the notice given by him to Marsden, to quit, a few months before the will was made; and that, too, was ruled in the king's bench to have been properly received. 1 Maule & Selw. 299; Ram on Wills, 39. I have quoted this case somewhat at large, because it wholly passed over the distinction referred to concerning real estate, without the least regard, and because it meets an objection of the plaintiffs' here, in which is said to consist the stress of their case, namely, that parol evidence cannot be received, to change the quantity of the estate or to alter it. In the case cited, such evidence was received, and for the very purpose of changing the quantity of the estate specifically devised, that is to say, of making the estate of John Southern greater or smaller, according to the construction to be founded thereon. And the case may be the more appropriately referred to here, since the interest of the specific devisee was controverted in it by the residuary devisee, just as, in the case before us, the residuary legatees contest the right of the daughters of John Vernor under the first specific devise in the will of Benjamin Vernor. That appears, indeed, to have been a case which would furnish much stronger ground than the present, for the objection to parol or extrinsic evidence introduced with a view of affecting the quantity of the estate devised, because there the doubt vibrated (if I may so speak,) directly between the specific and residuary legatee; it being admitted, that if the two closes did not pass to the former by the devise to him, the latter was entitled. Here, the question is more complicated; and the result would be different, should the

[ Vernor's Executors v. Fisher. ]

plaintiffs succeed.  In that event, the whole devise to the daughters of John Vernor must be declared void; and then the property, as the plaintiffs contend, does not pass to the residuary legatees, but to the executors, that they may sell the same, and convert the land into money, under the general residuary clause.  Now, if there is any one thing more abhorrent than all others, in the interpretation of last wills and testaments, it is the necessity of pronouncing a devise void: "for a devise is never construed absolutely void for uncertainty, but from necessity."  To prevent this, every effort is to be made to extract the purpose and design of the testator from all and every part of his will; and "if there be a possibility, to reduce it to a certainty, the devise is good; for the testator must be taken to mean something," says Lord Chancellor Cowper, "if it can, nor must the words of the will be void, if they *can have effect* by reasonable construction."   1 Atk. 411 ;  4 Bac. Abr. 334.

It is to give effect to the language of the testator, that extrinsic evidence is resorted to in any case.  In Lord Cheyney's Case, 5 Rep. 686, in *Beaumont* v. *Fell*, 2 Peere Williams, 140, in *Goodtitle* v. *Southern*, 1 Maule & Selw. 299, unless the evidence had been admitted, the wills could not have taken effect.  But where the will can have an effective operation without the evidence of extrinsic circumstances, such evidence has always been excluded. 1 Greenl. Ev. § 291.  This is the intelligible line of distinction, which has been drawn in the modern English cases, (see *Doe, Lessee of Sir A. Chichester*, v. *Oxenden*, 3 Taunt. 147,) and which is founded on the solicitude ever felt to give effect to the testator's intentions, that every part of his will may, if possible, stand.  But it is not to be forgotten, that the question as to the admissibility of testimony to explain this will, does not directly arise in the present cause; for all the facts are agreed on between the parties in the case stated, and the true and only question is in relation to their effect.

[ Vernor's Executors *v.* Fisher. ]

The devise in itself is free from ambiguity. But the plaintiffs introduce testimony out of the will to prove, that, at the time the will of Benjamin Vernor was made, there were three daughters of his deceased brother living; and having thus shown a latent ambiguity, they contend that the devise is incurably defective, because the subject is real estate; though they admit that if personal property, no matter to what amount, had been given in the same terms, the defect might, according to the authorities, be remediable. Having already spoken of this distinction, as it appears to have been recognised in some English cases, I will only add that it is not likely to obtain in Pennsylvania, where the freedom of alienation, liability for debts, and equality of distribution of real estate, place it in the same scale of dignity and consequence with personal property. There being no question concerning the admissibility of any of the evidence incorporated in the statement of this case, and the intention of Benjamin Vernor being indubitable to give a portion of his plantation to all the daughters of his brother John, shall it not prevail in the construction of his will? The intention of the testator, said M'KEAN, C. J., in *Ruston's Executors* v. *Ruston*, 2 Dall. 244, shall govern the construction of a will in all cases, except where the rule of law overrules the intention; and this is reducible to four instances: 1. When the devise would make a perpetuity; 2. When it would put the freehold in abeyance; 3. When chattels are limited as inheritances; and 4. Where a fee is limited on a fee.

The present case is within none of these exceptions. It is a mere mistake of the testator, with respect to the number of his brother's daughters. Similar mistakes have often occurred, and have always been corrected in the construction of devises and bequests. In *Campbell* v. *French*, 3 Ves. 321, where a testator by his will gave legacies to A. and B., describing them as grand-children of C., and their residence in America, and by a codicil he revoked these lega-

cies, giving as a reason that the legatees were dead; but *that not being true,* it was held that the will was not revoked, and that they were entitled to the legacies upon proof of identity. So where the residue of three per cent. annuities was given to the two daughters of A., and A. had *three* daughters, they *all,* on the ground of mistake, were decreed to take equal shares. This was the case of *Stebbing* v. *Walkey,* 2 Bro. Ch. 85. The gift was in trust to pay the same unto and *between* the two daughters of T. S. in equal shares and proportions during their lives, and if *either* of them should die, then to pay the whole to the *survivor* during life, and in case both should depart, the whole was to fall into the residue. T. S. had *three* daughters, and it was held that *all* the daughters should take. Mark here, the various phrases indicating an intention to give to *two* only: as, "between the *two* daughters of T. S. in equal shares; and if *either* of them should die, the whole to the *survivor;* and in case *both,*" &c. Observe, too, that the consequence of decreeing to all was to divide the fund into *three* parts instead of *two;* in other words, to alter the amount of the legacy to each of the legatees. So in *Tompkins* v. *Tompkins,* cited in 2 Ves. 564, where the testator gave to the *three* children of his sister £50 each; the sister had *four* children, and they were *all* let in. In *Sleech* v. *Thorington,* the bequest was to the *two* servants that should live with the testatrix at the time of her death, £100, S. S. stock, to be equally divided between them. In fact, she had but two at the time of making the will, and afterwards took another who lived with her at the time of her death: adjudged, that the *third* servant was entitled to an equal share with the other two. If A. devise land to the eldest son of J. S., by the name of *William,* when in truth his name was *Andrew,* the devise is good. Equity Ca. Abr. 212. So is a devise to Robert, earl of, &c., though his name was Henry. Co. Litt. 3. And the wife of J. S., earl of P., dean of D., &c., may take by such name, though the Christian name be

[ Vernor's Executors *v.* Fisher. ]

mistaken, for there can be no doubt who was meant by such name. Co. Litt. 3; Hawk. Abr. 4. So where a devise was to Margaret, daughter of W. K., and her name was Margery, it was held that she should take thereby, *quia constat de personâ,* by the description. 1 Freeman, 293. Devise of all the testator's lands to one of his cousin Nicholas Amherst's daughters, that shall marry a Norton within fifteen years. Testator dies. N. Amherst had three daughters, one of whom married a Norton within the fifteen years. *Held,* that this is a good devise to her, notwithstanding the uncertainty, and that the law supplies the words—*who shall first marry.* T. Raym. 84, *Bate v. Amherst.* If a man had devised land to Alexander Nowal, dean of St. Paul's, and to the chapter there and their successors, and Alexander Nowal had died and a new dean had been made, and afterwards the devisor had died, the land would have vested in the new dean and chapter; and yet it would not have vested *according to the words,* but according to the *intent,* for the chief intent was to convey it to the dean and chapter and their successors for ever; and the single person of Alexander Nowal was not the principal cause, though it might have been one of the causes of the devise. Viner's Abr. tit. Devise, C. pl. 4; Plowd. 334.

I shall conclude this citation of cases, which all go to illustrate the principle so emphatically laid down in *Findlay v. Riddle,* 3 Binn. 149, that the intention of the testator has always been deemed the *first, great, leading fundamental* rule of the construction of wills, with *Ungly* v. *Peate,* 2 Lord Raymond, 1312; a case which was first determined in the C. P., whose judgment was afterwards affirmed on a writ of error in K. B., and which strongly sustains the point that a devise is good if there is a possibility to reduce it to a certainty, and is never construed absolutely void for uncertainty, but from necessity. A house at Ludgate was devised "to S. and his brothers successively for their lives," and the testator, after mentioning another matter, went on

[ Vernor's Executors *v.* Fisher. ]

to say: "And as for my house at Ludgate, I do not leave it to S. nor his brothers, afore to be entered on and enjoyed till one month after their marriages." S. had at the time the will was made two brothers, R. and O.; S. was the eldest, R. the second, and O. the third son. R. died in the lifetime of S. and O. The question was, whether this was a good devise, or void for uncertainty? And it was argued against the devise, first, that it was void for uncertainty by reason of the word *successively*, not showing which should take first and which second, in succession; secondly, that the condition in relation to the marriage made it more uncertain, for till marriage none could take; and suppose the second brother had married, and neither of the other two, who must have taken? Certainly none of them: for if he that was married should take first, then that would overthrow the other construction of *successive*, that the oldest (and only brother named) should take first, then the second, and then the third. *Sed, per totam curiam*, the will was good and certain enough; for being in the case of brothers, the common law was a guide to the exposition of the word *successive*; viz. that the eldest should after his marriage enjoy it first for his life, and then the second, and then the third; and the court agreed that the clause about marriage made no alteration in the exposition of the will, but only added a restriction to the devise which before was general, and therefore if the second son had married before the eldest, yet he could not have taken by this devise.

Had the devise of Benjamin Vernor to the two daughters of his deceased brother John Vernor, and to John T. Vernor the grandson, been a joint devise, there might have been more room for doubt, as the effect of its being declared void with regard to the daughters, would in that case have been to pass the whole plantation to John T. Vernor, which was the testator's original intent. But as the two-thirds of this estate, if the devise to the daughters of John Vernor be void, will go, according to the plaintiff's coun-

[ Vernor's Executors *v.* Fisher. ]

sel, to the executors to be sold, or according to the defendant's counsel, to the heirs at law in general, it is impossible to doubt that such a disposition of the chief portion of his mansion farm would have been most abhorrent to the feelings, as it was alien from the thoughts of Benjamin Vernor.

The review of the whole case convinces me, 1. That Benjamin Vernor intended to devise his plantation to the immediate descendants, *i. e.* the daughters of his deceased brother John Vernor, and to John T. Vernor, grandson of his said brother; 2. That there being three of these daughters, the testator in devising to "two daughters" was merely mistaken as to the number, but that his chief and indeed only intention with respect to this part of the devise having been to give to *the daughters* of his brother, it is the duty of the court so to construe the will as to carry into effect such intention, which can only be done by letting in the third daughter. I accordingly decide that all the daughters of John Vernor are under this devise entitled, and that judgment be rendered for the defendants.

This case involved a question of great difficulty. The argument in the district court was very elaborate; and after the judgment was rendered, the devise was submitted to one of the most able and distinguished jurists in the United States, the late chancellor Kent. He was of opinion that it could not be maintained, but that it must be declared void for uncertainty. The cause was removed by writ of error to the supreme court, where it was fully discussed, and, after holding it under advisement for a year, the judges ordered a second argument, which being heard, they affirmed the judgment of the district court.