IN

# THE SUPREME COURT

OF

## PENNSYLVANIA.

EASTERN DISTRICT—PHILADELPHIA 1860.

## Guthrie's Appeal.

*Proper Application of the Rule in Shelly's Case.— Creation of Life Estates by Devise.—Descent of Estates Tail.*

1. Although the rule in Shelly's Case is the law of Pennsylvania, and is to be enforced whenever it is truly applicable, there is no reason why it should be more extensively applied here than in England.

2. In every case to which it is supposed to apply, it is always a precedent question whether the limitation of the remainder is made to the "heirs in fee" or "in tail" *as such*, and the rule is silent until the intention of the grantor or devisor is ascertained.

3. If the intention of the testator be that the remainder-men should take *as the heirs* of the grantee or devisee of the particular freehold, instead of themselves becoming the root of a new succession, the rule is applied, although it may defeat a manifest intention that the first taker should have but an estate for life.

4. In searching for this intention, the inquiry is not whether the remainder-men are the persons who would have been heirs, if the fee had been limited to the ancestor, but in what character the donor intended they should take the remainder: whether as heirs of the first taker, or, originally, as the stock of a new inheritance.

5. The words "heirs" and "heirs of the body," being words of limitation, and not of purchase, the law presumes them to be used in their legal sense, not to indicate individuals, but quantity of estate, and descent. The *onus* of rebutting this legal presumption, and of showing that they are words of purchase, and used to indicate individuals, is on him who affirms it; and when this is clearly and plainly manifest, the rule is inapplicable.

6. Although the rules of construction permit the words "heirs of the body," or "issue," to be used in the limited sense of "children," and the word "children,"—which primarily indicates, not heritable succession, but indi-

(9)

[Guthrie's Appeal.]

vidual acquisition,—to be used in the more comprehensive sense of the words "heirs of the body," in cases in which a clear explanation will justify a departure from their ordinary meaning, yet there must be an express warrant for this change. under the hand of the author of the gift, and conjectures, doubt, or even equilibrium of apparent intention will not suffice.

7. Estates tail are not embraced within the Intestate Act of 1833, and do not descend under it, but according to the course of the common law.

8. The cases of Price *v.* Taylor, 4 Casey 95; Williams *v.* Leech, Id. 89; McKee *v.* McKinly, 9 Id. 92, commented on.

9. Where the words of a will are, "I. give and bequeath to my daughter Elizabeth, wife of J. B., the use and life estate in her own proper person (but without power to convey the same to any other person for any period or term), of all my messuage, tenement, and lot or tract of land whereon she now resides with her husband, in the township of Brandywine, &c., containing fifty acres, and at the decease of my said daughter Elizabeth, the said lot or tract of land and appurtenances, I hereby bequeath to such of her children or their heirs as may survive her, as tenants in common, that is, the child or children of any deceased child of hers, shall hold the same interest and right that the deceased parent would have held, if living,"—and the children of Elizabeth were living at the time of the testator's death—it was held that she did not take an estate tail, but an estate for life in the property devised.

THIS was an appeal from the Orphans' Court of *Chester county*, confirming the report of the auditor, on the account of Joseph Guthrie, guardian of the minor children of Elizabeth Bones, deceased.

The case was this: Elizabeth Bones died in January 1848, leaving her husband, James Bones, and six minor children, in possession of a messuage and tract of land which her father, Robert Harris, deceased, by his will, dated March 6th 1847, had devised as follows :—

"I give and bequeath to my daughter Elizabeth, wife of James Bones, the use and life estate, in her own proper person (but without power to convey the same to any other person for any period or term), of all my messuage, tenement, and lot or tract of land, whereon she now resides with her husband, in the township of Brandywine, &c., containing fifty acres; and at the decease of my said daughter Elizabeth, the said lot or tract of land and appurtenances, I hereby bequeath to such of her children or their heirs as may survive her as tenants in common, that is, the child or children of any deceased child of hers, shall hold the same interest and right that the deceased parent would have held if living."

The children of Mr. and Mrs. Bones were all living at the death of Mr. Harris.

On the 24th of April 1848, Joseph Guthrie was appointed guardian of the estates of these minors; which appointment was revoked in June 1855. While acting as guardian, Guthrie rented away the property above mentioned, for two years, and for the remainder of the time allowed Mr. Bones and the family to occupy it, under an agreement that he was to support the

children for the rent.    On his discharge, another guardian was appointed, whereupon Guthrie filed an account charging himself with nothing, but claiming credit for $104 expended by him for the estate.

Objection was made, in behalf of the children, to the confirmation of this account, and an auditor was appointed, to whom the matters in controversy were referred.    There was no dispute before the auditor as to the estate which Mrs. Bones had in the land; but it was claimed that the accountant should be charged with a reasonable rent for the house and land, from the time of his appointment until his discharge, on the ground that Mr. Bones was of sufficient ability to support his children, without resorting to their property.

The auditor accordingly charged the guardian with rent at the rate of $100 *per annum*, from 1849 to 1854, adding interest,— allowed him credit for certain disbursements and for compensation, and reported a balance of $387.67 in his hands.

To this report exceptions were filed by the accountant.    The court below, on hearing, dismissed the exceptions, confirmed the report, and directed the accountant to pay over the balance in hands to the persons legally entitled to receive it.    From this decree Guthrie appealed to this court, assigning for error the confirmation of the auditor's report, and the refusal to strike out the charge for rent.

*U. V. Pennypacker* and *Wayne McVeagh*, for appellant, contended that Elizabeth Bones had an estate tail in the property, under the rule in Shelly's Case; that her husband was entitled to hold it as tenant in curtesy; and that, therefore, the charge against the guardian for rent, while it was occupied by Mr. Bones, was improper: citing Auman v. Auman, 9 Harris 343; Price v. Taylor, 4 Casey 95; William v. Leech, 4 Casey 89; Jones v. Morgan, 2 Brown C. C. 218; McKee v. McKinley, 9 Casey 92; Faries' Appeal, 11 Harris 29; Van Rensselaer v. Duncan's Ex., 12 Harris; and Dubs v. Dubs, 7 Casey 149.

*P. Frazer Smith* and *Wm. M. Meredith,* for appellees, argued: 1. That the interest of Mrs. Bones in this land was but a life estate in terms, and that the rule in Shelly's Case did not apply to the words "sons" or "children," but only to the word "heirs:" 5 Cruise's Digest, title 32, ch. 23, pl. 28; Price v. Taylor, 4 Casey 103; 6 Cruise's Digest, title 38, ch. 14, pl. 39, 43, and 297; 1 Hen. & Munf. 240; 1 East 264; 1 Harris 344; Archer's Case, 1 Report 66; Fearne, vol. 2, 238; 10 S. & R. 296; 3 Binney 139; 2 Rawle 168; 2 W. & S. 418; 2 Casey 227; 6 Casey 178; 5 Barr 385; 1 Rep. 93; 6 Rep. 16.

2. The word "heirs" may even be divested of its technical

meaning, if the intention of the testator requires it: 1 B. C. R. 219; Smith on Ex. Interests 479; Fearne 188, 189; 1 Mann. & Gr. 429; 3 Binney 153; 1 Harris 351–353; Hay on Estate Tail 35, 46; Atkyns 222; Powell on Devises 471; Gernett *v.* Lynn, 7 Casey 94; 2 Vesey 646; Wager *v.* Wager, 1 S. & R. 376.

3. Estates tail descend as at common law: 1 Yeates 313; George *v.* Morgan, 4 Harris 95; 1 Binney 96; 9 S. & R. 354.

4. Even if Mrs. Bones took an estate tail under the will of her father, the tenancy by curtesy claimed for her husband does not follow of course: 2 P. Wms. 316; 3 Atkyns 695; 1 Vesey 298; 4 W. & S. 95; 1 Harris 267; 2 Harris 361. He was excluded by the terms of the will.

The opinion of the court was delivered, Jan. 7th 1861, by

STRONG, J.—The words of the will of Robert Harris, out of which arises the controversy in this case, are as follows: "I give and bequeath to my daughter Elizabeth, wife of James Bones, the use and life estate in her own proper person (but without power to convey the same to any other person for any period or term), all my messuage, tenement, and lot or tract of land whereon she now resides with her husband, in the township of Brandywine, and county of Chester, which I purchased at sheriff's sale as the property of William Christman, and containing fifty acres, be the same more or less—and at the decease of my said daughter Elizabeth, the said lot or tract of land and appurtenances, I hereby bequeath to such of her children or their heirs as may survive her, as tenants in common, that is, the child or children of any deceased child of hers shall hold the same interest and right that the deceased parent would have held if living." At the time when the will was made, Elizabeth Bones had several children, and all her children were born before the will was proved, and probably before the death of the testator. The fundamental question is, what estate did she take under this devise? If more than a life estate, it must be by virtue of the rule in Shelly's Case, and the effort of the appellant has been to establish that under that rule she took an estate tail.

The rule which existed long before the case that gave it its name, is thus stated by Lord Coke in 1 Co. 104 (a): "When the ancestor, by any gift or conveyance, takes an estate of freehold, and in the same gift or conveyance an estate is limited either mediately or immediately to his heirs, in fee or in tail, always in such cases heirs are words of limitation of the estate, and not words of purchase." It has been somewhat differently stated by Preston, in his treatise on Estates, page 263, and again differently by Hayes, in his treatise on Estates Tail, page 4, and still differently by Smith, in his work on Executory Interests, page 400;

but in every statement of it, the essentials are substantially the same. The inheritance in remainder must be given to the heirs of the grantee or devisee of the estate for life, *as heirs,* or the rule has no applicability to the case. Preston's analysis of it shows that the limitation of the remainder must be to the "heirs," or "heirs of the body," of the person taking the particular estate "by that or some such substituted name, and not to the heirs as meaning or explained to be, sons' children," &c. Smith, in his work on Executory Interests, states as necessary to the application of the rule, that the limitation of the remainder should be to the heirs or heirs of the body, of him who takes the particular estate of freehold "by that description and in that character, or to his heir or the heir of his body, in the singular number, but as a *nomen collectivum* in the sense of heirs or heirs of the body." It is therefore always a precedent question, in any case to which it is supposed the rule is applicable, whether the limitation of the remainder is made to the heirs in fee or in tail, as such, and in solving this question, the rule itself renders no assistance. It is silent until the intention of the grantor or devisor is ascertained. But if that intention is found to be that the remainder-men are to take as heirs of the grantee or devisee of the particular freehold, instead of becoming themselves the root of a new succession, the rule is applied, though it may defeat a manifest intention that the first taker should have but an estate for life. It is very carefully to be noted, that in searching for the intention of the donor or testator, the inquiry is not whether the remainder-men are the persons who would have been heirs, had the fee been limited directly to the ancestor. The thing to be sought for is not the persons who are directed to take the remainder, but the character in which the donor intended they should take. In the very many cases in which the question has arisen, whether the rule was applicable, the difficulty has been in determining whether the intention was that the remainder-men should take as heirs of the first taker, or originally as the stock of a new inheritance; the effort in almost all of them has been to show that the words "heirs" or "heirs of the body," were not used in their technical sense, as expressive of the nature and extent of the devise, and its descent, but as *descriptio personarum,* designatory of individuals. To those words the law attaches a definite meaning. They are words of limitation, and not of purchase. When used by a testator, the law presumes that he used them in their legal sense, that he intended not individuals, but quantity of estate, and descent. Whenever they are employed, therefore, the burden is thrown upon him who contends that they are words of purchase, to rebut this presumption, and to show that they were used in the particular grant or devise to designate persons. Undoubtedly the word "heirs" may be shown by their context, to have been

used in the sense of sons, daughters, children, &c.; and when it is so used the rule in Shelly's Case is inapplicable: Fearne on Remainders 188, 189; Smith on Executory Interests 479. But the cases abundantly show that the intent not to use the words in their legal sense must be unequivocal, "·that it must appear so plainly (to use the language of Lord Alvanley) that no one can misunderstand it:" 3 B. & P. 620.

The limitation of the remainder in the present case, however, is not to the heirs or heirs of the body of Elizabeth Bones, the first taker of the freehold, but to "such of her. children or their heirs as may survive her, as tenants in common; that is, the child or children of any deceased child of hers shall hold the same interest and right that the deceased parent would have held if living." There is, therefore, no presumption that the remainder-men were intended to take as heirs, arising from the use of technical words of limitation. There is, indeed, a contrary presumption. The word children is not a word of limitation, but of personal description. In Burgar *v.* Bradford, 2 Atk. 222, Lord Hardwicke said, "Children, in their natural import, are words of purchase, and not of limitation, unless it is to comply with the intention of the testator, *when the words cannot take effect in any other way.*" Hayes also says (page 35), "But the words children, sons, &c., are properly descriptive of a particular class or generation of issue. They point not at heritable succession, but individual acquisition. Their effect differs in nothing from a designation of individuals by name, except that a devise to several '*nominatim*' as tenants in common, fails as to the shares of those dying before the testator." He adds, "The rules of construction freely permit, however, the use of the words 'heirs of the body,' or 'issue,' in the limited sense, of children, and of the word children in the comprehensive sense of the words 'heirs of the body,' these rules, or rather the fundamental principle of legal interpretation, requiring only a clear explanation to justify a departure from the ordinary meaning, imposing on those who would translate the term, the *onus* of producing an express warrant under the hand of the author of the gift." Admitting now, with Mr. Hayes, that the word "children" may be construed to mean "heirs of the body," yet there must be, as he says, an express warrant for this change of its legitimate meaning, under the hand of the author of the gift. The intention to use it as a word of limitation, contrary to its natural import, must be rendered clear by the words of the grantor or testator himself. Conjecture, doubt, or even equilibrium of apparent intention, will not suffice. The language of Mr. Justice Blackstone, in his celebrated argument in the case of Perrin *v.* Blake, is well worthy of notice. After stating that the question of the testator's intent was not upon the quantity of estate

[Guthrie's Appeal.]

intended to be given to John Williams, the ancestor, but upon the *nature* of the estate intended to be given to the heirs of his body, and declaring that if the testator intended they should take as *purchasers*, then John, the ancestor, remained only tenant for life; and that if he meant they should take by descent, or had formed no intention about the matter, then by operation and consequence of law, the inheritance first vested in the ancestor, he adds, " The true question, therefore, is whether the testator has or has not plainly declared his intent that the heirs of the body of John Williams shall take an estate by purchase, entirely detached from and unconnected with the estate of their ancestor." (The words used in the will were "heirs of the body," and the defendant laboured to show that they were words of purchase.) Mr. Justice Blackstone further remarked, " It is not incumbent on the plaintiff to show by express evidence, that his testator meant to adhere to the rule of law (i. e. that heirs of the body are words of limitation), for that is always supposed till the contrary is clearly proved; but it is incumbent on the defendant to show by plain and manifest indications, that the testator intended to deviate from the general rule; for that is never supposed till made out, not by conjecture, but by strong and conclusive evidence." But children, in law, is as certainly held to be a word of purchase as "heirs of the body" are to be words of limitation. If there be so much difficulty in converting " heirs of the body" into words of personal description, at least equal difficulties must surround the attempt to elevate the word children into a word of limitation. It in itself ascertains only the objects of the grant or devise, not at all the nature or extent of the estate given. These must be sought for elsewhere. It is worthy of notice, that among the eighty-two cases contained in the tables of Mr. Hayes, there is not one in which a devise of the remainder to children was held within the scope of the rule in Shelly's Case, and to vest an estate in tail in the ancestor, to whom a freehold for life was limited by the same will or conveyance. In every case in which an estate tail was held to have thus vested, the author of the gift had made use of the words "heirs of the body," or "issue," which latter is a word of doubtful meaning, though generally a word of limitation in a will; and if he used the word " son," he used also in explanation of it, and as its synonym, the word "issue." In most of the cases where the word son was used, the tenancy in tail of the ancestor was implied, not from that word, but from a devise over " *on failure of issue.*" It is not denied, that the word children may be used by a testator as a *nomen collectivum*, signifying "heirs of the body," but I have found no case in which it has been held to have been so used, unless the testator has also employed the words "heirs of the body," or "issue," as descriptive of the

[Guthrie's Appeal.]

same objects.   Nothing less appears to be sufficient to repel the presumption that the testator did not intend a limitation by the use of this word of purchase.   There is no such thing in this case.   There is nothing indicative of the testator's purpose that the remainder-men should not take as purchasers, but as heirs of Elizabeth Bones, unless it can be found in the fact that they are the same persons who would have inherited the estate, if it had been limited in fee directly to her.   That throws no light, however, upon the nature of their estate.   It refers only to the objects of the testator's bounty.   It would have existed if they had been described *nominatim*, and then, doubtless, it would have been utterly insufficient to rebut the presumption arising from the use of the word children, that they were intended to take as purchasers, and not through their mother.   Nor is the limitation of the remainder to children surviving the first tenant of the freehold, and to children of children who may be deceased at the death of that tenant, unequivocally indicative of an intention that they shall take as heirs of the tenant for life.   At most, it is but a description of persons, with the part to be taken by each.   It points to no line of succession.   It does not refer to Elizabeth Bones as the root of descent.   Without the word "heirs" applied to the remainder-men there is still nothing to show that the testator looked beyond those who might be in being when Elizabeth Bones should die, or that he had in view any continuous line of succession.   When it was said, as it was in a recent case (McKee *v.* McKinley, 9 Casey 93), that "if the remainder is to persons standing in the relation of heirs, general or special, of the tenant for life, the law presumes them to take as heirs, unless it unequivocally appears that individuals, other than persons who are to take simply as heirs, are intended," the assertion was too broad.   Such a presumption is made only when technical words of limitation are applied to the remainder-men, when the gift is to "heirs" or "issue."   It will be seen from some of the cases hereafter to be cited, that the fact that the remainder-men stand in the relation of heirs, is insufficient to overcome the presumption of law, that by "sons," &c., purchasers were meant, even though the testator directed that they should take in the order of heirs.

Besides, there are in this will provisions, which, in addition to the description of the remainder-men by the term children, show an intent that they shall not take *as heirs* of the tenant for life. The gift is to them distributively, as tenants in common, or to their heirs.   Such a taking distributively as tenants in common, is altogether inconsistent with the children taking as heirs in tail of their mother, the devisee of the life estate.   Certainly, always in England, and in this state, until the Act of 1833, if not since, estates tail generally descended, not according to our intestate

laws, but to the heir at common law. A direction that the children should take in common was, therefore, repugnant to their taking as heirs of the body, and it evinces an intent that they were to take as purchasers. True, it has been ruled that, in cases where the remainder is limited to "heirs of the body," a direction that they shall take distributively, will not prevent the application of the rule in Shelly's Case; but this is because the presumption of limitation arising from the use of the word "heirs," is too strong to be rebutted by the repugnant provision for distribution. It never yet has been held that such a provision can be rejected when the remainder is limited to objects described by apt words of purchase. So, too, it has been held that the rule applies, though, in addition to the first words of inheritance, viz., heirs or heirs of the body, there are super-added words of limitation, similar to the first, but this is for the same reason. It is a mistake to argue that, because certain things will not suffice to convert "heirs" or "heirs of the body" into words of purchase, they are of no consequence when the search is for the meaning of children, or any other word naturally descriptive of persons, rather than estates. And even when the limitation is to heirs of the body, to take distributively, with similar words of limitation added, such a direction is held to convert even the technical words, "heirs of the body," into words of purchase: Smith on Exec. Int. 488; Fearne on Rem. 154.

It is contended, however, that under the doctrine of Price v. Taylor, 4 Casey 95, estates tail descend under our intestate law of 1833, and hence, that the limitation to the children of the testator's daughter and the children of her deceased children, to take as tenants in common, the grandchildren, what would have been the share of the deceased parent, was in accordance with our rules of lineal descent. From this it is argued that the direction that they should take distributively, is equivalent to a direction that they should take as heirs.

Price v. Taylor, however, is not to be regarded as a decision that estates tail are embraced within our Intestate Act of 1833. It contains, indeed, an intimation that it may be so, with some reasons for the supposition given by the learned judge who delivered the opinion. The suggestion is repeated by the same judge in Williams v. Leech, 4 Casey 89. To this suggestion we cannot assent. However just such descent may seem, however consonant it may be with the general tendency of our customs and laws, descent of such estates, according to the course of common law, had, up to 1833, been an established rule of property in this state; and such rules are not to be regarded as destroyed by statute, unless by express direction or necessary implication. There is no such direction or implication in the

1 Wr.—2

Act of 1833.   Certainly, until that time, estates tail descended as at common law.   They were not embraced within any of our former intestate acts.   A reference to the language of each makes it clear that the subject-matter for distribution or descent, has been the same in them all.   The Act of 1705 enacted that " the surplusage or remaining portion of the intestate's lands, &c., not sold or ordered to be sold by virtue of the act, and not otherwise limited by marriage settlement, shall be divided," &c.   In Goodright *v.* Morning Star, 1 Yeates 315, the question arose whether estates tail were embraced within it, and it was held that they were not.   The court said that it was too late now (in 1793) to stir the point, whatever reason there might have been for it in the first instance.   The invariable opinion of lawyers, said they, since the Act of 1705, has been that lands entailed descended according to the course of the common law; and it is understood generally that it had been so adjudged in early times.   All the common recoveries which have been suffered by the heirs of donees in tail have been conformable to that principle; to unsettle so many titles at this late day would be productive of endless confusion.

Our Act of 1705 only regulates the descent of lands amongst the children, where the father is seised thereof, and might dispose of them by deed or will.   It leaves other cases of descent as they were at common law.   Then came the Act of 1794, a substitute for that of 1705, the language of which is, " The remaining part of any lands, tenements, and hereditaments, and personal estate of any person deceased, not sold or disposed of by will, nor otherwise limited by marriage settlement, shall be divided and be enjoyed in manner following," &c.   It is obvious that it was intended to follow the preceding Act of 1705.   It never was supposed that any provision was made for the descent of estates tail.   They continued to descend as at common law, without question at least, until the Act of 1833.   No one doubts this.   The courts and the profession concurred in the opinion that estates tail and trusts were not within the purviews of the intestate laws: Jenks *v.* Backhouse, 1 Binn. 96; Lyle *v.* Richards, 9 S. & R. 354.   When the Act of 1833 was passed, the former acts had received a settled judicial and professional construction.   Nor did that act profess to include estates tail.   Its language was evidently taken from that of the preceding statutes. The words are, " The real and personal estates of a decedent remaining after the payment of debts and legal charges, and which shall not have been sold or disposed of by will, or otherwise limited by marriage settlement, shall be divided and enjoyed as follows."   It cannot be maintained that there is any substantial difference between these three acts in the particular now under consideration.   They all point to property over which

the decedent had a power of testamentary disposition, and they step in only to supply the failure of such disposal. Now, as the former acts were well understood not to include estates tail, it must be inferred that when the legislature adopted, in the Act of 1833, substantially the language of those acts, they used it in the sense then understood, and had not in view such interests. It would have been a great change of a well known rule of property, to have included such interests in the intestate laws, and it is not to be supposed that if the legislature contemplated such a change they would not have used language clearly expressive of their intent. The common law is the law of Pennsylvania, and can only be changed by legislative enactment, clearly indicating an intention to work a change. The presumption always is, that no alteration is intended. It is suggested in Price v. Taylor, as one reason for the supposition that estates tail may descend under our Act of 1833, "that our old statutes of descent provided only for the descent of lands which the decedent could dispose of by deed or will, and estates tail did not then fall within that category. But the Act of 1799 changed this, and allowed estates tail to be sold and conveyed in a very simple form. Therefore, it is said, "the new law of intestates of 1833 expressly includes such estates, because it declares the line of descent of all land which the decedent might have sold in his lifetime, or disposed of by will." There is, however, nothing in the Acts of 1705 and 1794, as assumed in this reason, which describes the property contemplated by them as only that which the decedent might have disposed of by deed. The words "dispose of by deed," are not in either of the acts. The language of the first is, "not sold or ordered to be sold by virtue of this act," evidently referring to the remainder, after so much should have been disposed of as was necessary for the payment of the decedent's debts. It contemplated no sale by the decedent, but sales by his representatives. And even before the Act of 1799, a tenant in tail could sell and bind his issue. Common recoveries were always in use in this state. The Act of 1799 only gave a new form of conveyance. True, until its passage, he could not sell by deed, but the Act of 1705 does not speak of sales by deed. Moreover, it would have been strange if the legislature, undertaking to distribute what a decedent might leave at his death, should deem it necessary expressly to exempt from such distribution what the decedent did not leave, what he had sold before his death, and over which they had no power. A mistaken reason is therefore assigned for the fact that estates tail were not within former intestate laws. Both the Acts of 1705 and 1794 contemplated the possibility of sales under direction of the Orphans' Court, before descent could take effect. The words of the former were, "not sold or ordered to be sold *under*

*this act;*" those of the latter were, "not sold or disposed of by will." It was never doubted that the meaning of the words in the latter act was the same as of the words in the corresponding clause of the former. It is apparent, then, that the premises from which the learned judge draws his conclusion in Price *v.* Taylor, are unfounded. The conclusion is equally obnoxious to just criticism. It assumes the very thing in argument, when it says that the Act of 1833 "declares the line of descent of all lands which the decedent might have sold in his lifetime, or disposed of by will." Such is not the language of the act. It is the real and personal estate, &c., "remaining after payment of all just debts and legal charges which shall not have been sold, or disposed of by will, or otherwise limited by marriage settlement." When it is considered that this act took the place of the former intestate laws, the construction of which was settled, that its language is so similar, and especially that it speaks only of what remains after the payment of debts and legal charges, the obvious reference of the word sold is not to a disposition by the intestate in his lifetime, but to sales by the administrator under order of the Orphans' Court.

The second reason assigned for the conjecture that estates tail may descend under the Act of 1833, is thus stated in Price *v.* Taylor : "Our statute of wills, passed on the same day with the intestate law, and one of its supplements (May 6, 1844), provides for a lineal descent, in order to prevent a devise to a child, or to a brother or sister, from lapsing by the death of the devisee in the lifetime of the testator, and in such case the descent goes, according to our law of lineal descents, on the supposition that such is the testator's intention, that is, on the principle of entailment until it vests."

This provision in the statute of wills was taken from the Act of 1810, and therefore cannot be called in to aid in the construction of the intestate law of 1833. And it is observable that the provision of the act declaring that a devise to a child who dies before the testator, shall be good and available in favour of the issue of such child surviving, "with like effect as if such devisee had survived the testator," is equally applicable to a devise to a child in tail. This seems, therefore, a very insufficient reason for holding that the legislature, in using the words of the Intestate Act of 1833, intended them in a very different sense from that in which words almost similar had always been understood before.

The other reasons given for the suggestion are such as grew out of the change of our customs and laws, and the policy of having our laws simple and homogeneous. Primogeniture, it is said, is no longer supported by our customs, and hence it is argued that we ought no longer to presume that lineal descent is

intended by words of general entailment.    That something else than descent under the intestate laws is meant, it is inferable from the use of 'fit words to set in motion a different descent. But, whether it be so or not, it is certain that, down to 1833, our customs did recognise descent of such estates, according to the course of the common law. ˙ In all other cases primogeniture had, long before that time, been abolished.

Admit that this was an exceptional custom, it was still a settled rule of property, and whatever may be our opinions as to the policy of its continuance, it could be changed only by the legislature, except at the expense of disturbing multitudes of titles.    In inquiring what the legislature has done, we are aided but little by considerations of policy and symmetry.    At last we are driven back to the language of the statute.    There, and there only, has this rule of property been destroyed, if it be no longer in existence.

Holding, therefore, that estates tail are not embraced in our intestate law of 1833, full effect must be given to the words of distribution in this will.    If the words " or their heirs" are to be regarded as words of limitation of the estate given to the remainder-men, then they settle the question.    That words of distribution, with words of limitation superadded, show that the remainder-men take not as heirs even, though described as such, but as a new root of succession, is too well established for controversy: Doe v. Lanning, 2 Burrows 1100; Right v. Creber, 5 B. & C. 866; 5 Man. & Grang. 628; Finley v. Riddle, 3 Bin. 139; Stump v. Findlay, 2 Rawle 168; Abbott v. Jenkins, 10 S. & R. 296.    If, on the other hand, the words " or their heirs" are to be regarded, as subsequently explained, to mean the child or children of deceased children, then there is nothing that looks to succession, nothing that looks beyond the individuals that might be in being at the death of Elizabeth Bones.

. The rule in Shelly's Case is the law of Pennsylvania, but there is no reason why it should be applied more extensively than in the country from which it derived its birth.    It often defeats the declared will of a testator, and frustrates his purpose of making provision for more than one generation of his family.    Still it is to be enforced whenever it is truly applicable.    But it has been held from Wild's Case, 6 Coke, down to the present day, that when the devise of the remainder is not to " heirs" or " heirs of body," but to " children," they take as a new stock, and not as heirs.    In Goodtitle v. Herring, 1 East 164, there was a limitation for life, with a remainder to the " heirs male of the body" of the tenant for life, severally, successively, one after another, as they and every of them should be in seniority of age and priority of birth, the elder of such sons and the heir male of his body being always preferred before the younger of such son or

sons, and the heir male of his and their body and bodies, and for want of such issue then to the daughters, &c., and in default of such issue over. The description embraced the whole line of lineal heirs, preferring them in the order of common law descent, and they were described as "heirs male of the body," yet as they were also called sons, the latter designation overcame the force of the technical words of limitation, and the parent took but an estate for life : See also North *v.* Martin, 6 Sim. 266 ; Doe *v.* Provost, 5 Johns. 61 ; Gernet *v.* Lynn, 7 Casey 94. The latter case is very like the present. In it, the late Chief Justice Lewis remarks : "It is, therefore, very clear that when the term children is used to designate the object of the testator's bounty, and some of them are *in esse* at the date of the will, and also at the time it takes effect, neither the policy nor the words of the rule apply." After a pretty thorough search, I have not been able to find a single such case in which the rule has been applied, prior to Williams *v.* Leech, 4 Casey 89, and even in that case there were no children of the first taker at the date of the will, nor even when it took effect. That case, however, does treat the word children as if it meant heirs in the will then before the court. It was followed by Naglee's Appeal, 9 Casey 89, a construction of the same will, and by McKee *v.* McKinley, 9 Casey 92. In the former of the cases, there was, in the first place, an absolute gift of the fee simple, to the daughter of the testator, then unmarried, and without children. In a subsequent part of the will the testator provided that none of his children should sell or convey any of the real estate devised to them, but enjoy it during life, and that after their death it should be divided equally among their children and their heirs. This was followed by a devise over to the surviving children, if either of his children should die "without issue." It might have been argued, though I think unsuccessfully, that the testator had used the words issue and the children as of the same import. The decision, however, was not put upon that ground. The will was regarded as a gift of the fee to the first taker, followed by an unavailing attempt to restrict alienation. It was also quite strongly intimated that it might be an estate tail in the daughter. The case of McKee *v.* McKinley was that of a devise for life, remainder to the children of the tenant for life, if any surviving, or issue of such children, and in case of no children or issue of children, then over to the relations and lawful heirs of the testator. This was held an estate in fee simple in the first taker.

The case was evidently an amicable one. There appears to have been no argument except in support of a tenancy in fee of the first taker, and the decision was by a bare majority of the court. Neither this case, nor that of Williams *v.* Leech, nor Naglee's Appeal, in the particulars of which we have spoken, is

[Guthrie's Appeal.]

sustainable on authority. If they are to be regarded as the law of the land, the result must be a wide disturbance of titles, the foreshadowings of which are already to be seen, an extension of the rule in Shelly's Case far beyond all precedent, and an insuperable obstacle in the way of testators against making such settlements of their property as have been common ever since statutes of wills existed.

Enough has, however, been said, to show that under the will of Robert Harris, Elizabeth Bones took only an estate for life, and, consequently, that the decree of the Orphans' Court was correct.

LOWRIE, C. J., dissented.

WOODWARD, J.—When the case of Williams & Wife v. Leech, 4 Casey 89, came into this court from the Nisi Prius, it was, after argument, referred to me to prepare the opinion.

I wrote a full opinion, affirming the decree at Nisi Prius; but, on consultation with the other members of the court, it was set aside, and my brother LOWRIE's opinion was adopted, reversing the decree. I submitted in silence, as I supposed it was my duty to do, to the ruling which prevailed, not only in that particular case, but in others which followed it, involving the same or similar questions.

It has now happened, however, in the mutations of the bench, that a majority reject that ruling, and again I submit, but with more satisfaction than before. Such is my regard for the doctrine of *stare decisis*, and such my confidence in the learning and ability of the judges who ruled Williams v. Leech, that I would stand by it still, and silence this vexed question if a majority of the court, as now constituted, felt themselves free to stand with me; but as they do not, I go with them to restore the old law, in the hope that the question will in this manner be effectually settled.